[S. F. No. 737. Department Two.—March 3, 1899.]

CHARLES GOLDSTONE, Appellant, v. MERCHANTS' ICE AND COLD STORAGE COMPANY, Respondent.

123 625
127 237
123 625
189 394
123 625
147 586

NONSUIT—SUFFICIENCY OF EVIDENCE—ERROR.—A nonsuit should be denied where the evidence and the presumptions reasonably arising therefrom are legally sufficient to prove the material allegations of the complaint. It is error for the court to grant a nonsuit where, if the case had gone to a jury, on the plaintiff's evidence, and a verdict had been rendered for plaintiff, the evidence would be sufficient to support a judgment upon the verdict.

ID.—MOTION—ADMISSION.—A motion for a nonsuit admits the truth of the plaintiff's evidence, and of every inference of fact that can be legitimately drawn therefrom.

ID.—INTERPRETATION OF EVIDENCE.—Upon motion for a nonsuit the evidence should be interpreted most strongly against the defendant.

ID.—APPLICATION OF RULES—TRIAL BY COURT.—The rules as to nonsuit are the same, and shall have the same application, when the trial is by the court, as when it is by a jury.

SALE OF GOODS IN WAREHOUSE—STORAGE RECEIPTS—LIEN—ORDERS—
BONA FIDE PURCHASER.—Where part of goods stored in a warehouse,
for which storage receipts were given to the owner, were sold
by the owner to a firm which paid part of the purchase money,
and gave a note for the remainder, purporting to give the owner
a lien upon the goods to secure the note, but the owner gave an
order upon the warehouseman to such firm for the goods, which
subsequently sold them to a *bona fide* purchaser in the ordinary
course of business for full value, and gave to him an order for
the goods, which were then segregated and set apart to him by
the owner of the warehouse, to whom he thereafter paid storage
therefor, such *bona fide* purchaser is protected against the
original owner of the goods, and cannot be compelled to pay the
residue of the purchase money due to such owner from the
first purchaser.

ID.—NOTICE TO PURCHASER—RECEIPT FOR GOODS DELIVERED—DESIGNA-
TION OF STORAGE RECEIPT.—A statement in the order given to the
firm, " no goods delivered without a receipt properly filled out,"
merely imports that the warehouse must take a receipt for the
goods delivered as evidence of delivery, and does not impart
notice to a subsequent purchaser of any claim of the owner
upon the goods delivered. Neither does a designation in the
order from such firm for delivery of the goods sold and set apart
to the *bona fide* purchaser, as being "storage receipt No. E. 55,"
put such purchaser upon inquiry as to any rights of the original
owner of the goods, as against the firm.

ID.—PRESUMPTION AS TO NEGOTIABILITY OF RECEIPTS—IMPLICATION FROM
ORDER.—Under the provision in the act of 1878 (Stats. 1878, p. 949),
providing that in case of negotiable warehouse receipts, goods
can be delivered only upon presentation of the receipt, and in-
dorsement thereon of the goods delivered, while in case of non-
negotiable receipts the warehouseman may deliver goods upon
the written order of the person holding the receipts, there can
be no presumption that warehouse receipts are negotiable; but
where an order is given upon the warehouseman by the owner
of the receipts, the implication is that the receipts were non-
negotiable.

ID.—SALE OF PROPERTY IN POSSESSION OF BAILEE—PROTECTION OF PUR-
CHASER—CONSTRUCTION OF CODE.—Under section 1142 of the Civil
Code, which provides that "where the possession of personal
property, together with a power to dispose thereof, is transferred
by its owner to another person, an executed sale by the latter,
while in possession, to a buyer in good faith and in the ordinary
course of business, for value, transfers to such buyer the title
of the former owner," the possession mentioned does not neces-
sarily mean actual, exclusive, manual possession. Where the
property is in the possession of a bailee, it is sufficient to trans-
fer the right of possession to the purchaser, subject to the
bailee's lien.

APPEAL from a judgment of the Superior Court of the City and County of San Francisco.   William R. Daingerfield, Judge.

The facts are stated in the opinion.

Naphtaly, Freidenrich & Ackerman, for Appellant.

Dorn & Dorn, and Fox & Gray, for Respondent.

CHIPMAN, C.—The action is to recover the possession of certain eighteen boxes of dressed turkeys (three thousand eight hundred pounds), or the value thereof if delivery cannot be had. The answer alleges that the turkeys were deposited with defendant by one Hoerr, in his own name, for safekeeping, and were the property of said Hoerr and one Clements, partners as Clements & Hoerr.   Plaintiff was nonsuited at the close of his evidence, and judgment for defendant was entered accordingly. The appeal is from that judgment upon a bill of exceptions containing the evidence.

Appellant claims that the judgment was erroneous for two reasons: 1. The evidence shows title and right of possession in plaintiff; 2. Defendant is estopped from denying plaintiff's title.

1. A nonsuit should be denied where the evidence and the presumptions reasonably arising therefrom are legally sufficient to prove the material allegations of the complaint.   (*De Ro v. Cordes*, 4 Cal. 118; *McKee* v. *Greene*, 31 Cal. 418; *Alvarado v. De Celis*, 54 Cal. 588; *Felton v. Millard*, 81 Cal. 540; *Higgins v. Ragsdale*, 83 Cal. 219.)   The proof must be sufficient to raise more than a mere surmise or conjecture that the fact is as alleged, and must be such that a rational mind can draw from it the conclusion that the fact exists.   (*Janin v. London etc. Bank*, 92 Cal. 14; 27 Am. St. Rep. 82.)

It has also been held that whenever the evidence introduced by plaintiff so conclusively establishes a defense as that the court might properly grant a new trial in case of a verdict in his favor upon like evidence, the court may direct a judgment by way of nonsuit.   (*McQuilken v. Central Pac. R. R. Co.*, 50 Cal. 7.)

On January 29, 1895, defendant had on storage at its warehouse in San Francisco a lot of dressed turkeys.   One Dunbar, of the firm of J. W. Dunbar & Co., engaged in the commission

business, notified dealers on that day that he had a lot of turkeys in defendant's warehouse and invited their examination. Plaintiff and one Miller, among others, went with Dunbar to examine the turkeys, accompanied by an employee of defendant, who opened the cases containing the turkeys for their inspection. Upon coming out of the cold storage room of the warehouse Dunbar sold to plaintiff and Miller each a lot of these turkeys at twelve and a half cents per pound, and on that day made entry on his books of the sale. Plaintiff said he would take about five thousand pounds. He testified: "I asked Dunbar if that meant cash, and he said that I could have a little time on it. I told him that when he would give me the bill I would pay a portion, the middle of the month, and the balance at the end of the month of February. About the 5th of February we met and he handed me a bill for the turkeys. I thereupon gave him my note for the amount, payable in thirty days, and on the 8th of February I paid him upon the note two hundred dollars. When I gave him the note he gave me an order on the cold storage company." Plaintiff's note, dated February 5, 1895, to J. W. Dunbar & Co., for five hundred and three dollars and sixty-two cents, due thirty days after date, showing a payment of two hundred dollars on February 8th, is in evidence. Dunbar & Co. gave plaintiff the order on the defendant February 5th, which reads:

"Please deliver to C. Goldstone the following goods: Storage receipt No. E 55, 14 boxes Gob. 3380, Tare 507-2873. Storage receipt No. B, 6 Bxs. Hens, 1310-14-1156.

"J. W. DUNBAR & CO.,

"M.

"No goods delivered without a receipt properly filled out."

Plaintiff testified that on receipt of this order he went to defendant and informed the bookkeeper, and was told that they were aware of it, as they had received a duplicate from Dunbar. Dunbar testified that after the sale to plaintiff, defendant segregated plaintiff's turkeys and marked them E 55; that this was done before he gave plaintiff the order, and it is inferable that it was done on the 29th of January, when the sale was made, for in the record is a bill for storage rendered by defendant to plaintiff bearing that date, in which the packages are referred to as marked E 55, and the bill shows that plaintiff paid defendant

storage from January 29th to March 29th, two months, forty-six dollars and ninety cents.    Some question was raised as to whether plaintiff should pay storage for any part of January, for the reason that Dunbar claimed to have paid storage for that month. But it is reasonably deducible that defendant treated the sale as made January 29th, and that the packages were then segregated and marked for plaintiff "E 55," while Miller's were marked "A 55."    Plaintiff testified: "On the 1st of March I called on the storage company for some turkeys, and received two cases.    I made no payment to them when I got this lot of turkeys.    They delivered them on my order.    The first time they informed me of the claim that there was ten cents payable on those turkeys was on the 7th or 8th of March.    I went there at that time and demanded my turkeys.    I was refused, and they said I would have to pay ten cents a pound if I wanted any more turkeys.    I asked the reason why, and they said those turkeys are not paid for yet.    I told him I had paid for them, and I asked him why he had sent me the cold storage bill, and they said that made no difference, that if I wanted law to go ahead."    Defendant at no time told plaintiff that any person other than Dunbar & Co. owned or claimed the turkeys.    Plaintiff further testified that he had not been notified of any claim on the turkeys before that time.    "I went in the office in front and said: 'I want two cases of turkeys,' and they said, 'All right, send your drayman.' I said: 'I want from E 55 one case of hens and one case of gobblers.' . . . . I did not pay ten cents a pound for them, and if anybody else did I did not know it.    Those were the only turkeys I took out until the suit was filed."

Defendant claims that Dunbar & Co. had no title, and therefore plaintiff got none; that Dunbar had made a conditional purchase from Hoerr, who, it is claimed, was the real owner, on which Dunbar had paid but two and a half cents per pound, and there was still due ten cents per pound, to secure which Hoerr had a lien on the turkeys.    The evidence on this point is given by Dunbar, plaintiff's only other witness.    He testified that he bought the Goldstone and Miller turkeys from Hoerr.    On cross-examination he testified: "I bought them on the 29th of January.    There was no specific amount stated at the time; any amount that I could sell.    I paid twelve and a half cents per

pound.  I paid two and a half cents, leaving ten cents per pound unpaid.  The only portion of the remaining ten cents per pound which I paid was on account of withdrawals from the cold storage company of parts of the goods.  When the people to whom I sold them wanted some of the goods I went to the cold storage company and paid the ten cents per pound from time to time, in order to release them.  On the goods that were in the cold storage company at the commencement of this suit I have not paid any portion of the ten cents per pound."  On redirect examination he testified: "I gave to Mr. Hoerr, for the balance of what I owed him on account of those turkeys, my note."  This note is for nine hundred and sixty-six dollars, and is dated January 29, 1895, payable March 30, 1895, to order of F. J. Hoerr, at Anglo-California Bank, and is in the usual form, signed J. W. Dunbar & Co.  After the signature at the bottom of the note is the following: "Secured by poultry in refrigerators."  Witness testified that he didn't think this was on the note when he signed it, but was not certain.  He said, however, if it was there he didn't see it.  He further testified that he paid defendant on March 1st forty dollars for the release of two cases of turkeys for Goldstone, and that "at the time I gave the note to Mr. Hoerr it was understood that the ten cents per pound was to be paid on delivery of the poultry."  There is no evidence that plaintiff knew of this payment, and he testified that he did not.  Dunbar also testified: "Some two or three days after the dealers were there to look at the turkeys, as stated, Mr. Hoerr gave me an order and I sent it to the cold storage company"; and, as already stated, he testified that Hoerr had sold him such of his turkeys as he, Dunbar, could sell.

It clearly appears, we think, that plaintiff purchased from Dunbar & Co. in good faith, in the ordinary course of business, and paid the consideration in full, for the evidence tends to show that the note given for the balance was in payment and was so received.  There is no evidence from which it can be said that plaintiff knew or was in any wise warned that there was any claim upon the turkeys by any person other than Dunbar & Co., except it may have been by defendant for storage, and this claim plaintiff paid.  In the order given by Dunbar & Co. upon defendant to deliver the turkeys to plaintiff was written: "No goods

delivered without a receipt properly filled out." This obviously meant only that defendant must take a receipt for turkeys as delivered to plaintiff as evidence of delivery.

Respondent claims that this meant to give plaintiff notice and put him upon inquiry as to the outstanding warehouse receipts issued by defendant to Hoerr; and it is claimed that a presumption arises that defendant duly issued receipts as a warehouseman, and dealt with the goods strictly pursuant to the act of 1878. (Stats. 1878, p. 949. Citing Code Civ. Proc., sec. 1963, subd. 33.)

This act contemplates two classes of receipts: 1. Negotiable; and 2. Nonnegotiable; and in case of the latter class, the warehouseman may deliver the goods upon the written order of the person to whom the receipt has issued. In the former case he can deliver goods only upon presentation of the receipt and indorsement thereon of the goods delivered. We cannot presume that Hoerr's receipt was of the former class. His giving Dunlap an order for the goods would imply rather that the receipt of defendant, if there was one, was of the latter class.

In the order given to plaintiff is found the words, "Storage receipt No. E 55," and "Storage receipt No. B," and it is claimed that these clauses had reference to the defendant's outstanding warehouse receipts which it was plaintiff's duty to look after and surrender, and if he had done so he would have learned of Hoerr's claim. I do not think the words imposed any such duty. They are vague and convey no information to the holder, however intelligible they may have been to the warehouseman. The reference to "receipt No. E 55" was plainly to the segregated lot purchased by plaintiff, and it is impossible to say what "storage receipt B" referred to. We think these references were not such as to put plaintiff on notice or inquiry as insisted by defendant.

Dunbar's testimony as to his purchase from and payment to Hoerr is somewhat confused and contradictory. The motion for nonsuit admits the truth of plaintiff's evidence and every inference of fact that can be legitimately drawn therefrom (*Wright v. Roseberry*, 81 Cal. 87; *Warner v. Darrow*, 91 Cal. 309); and I think upon such motion the evidence should be interpreted most strongly against the defendant. I think also that the rules as to

nonsuit are the same whether the trial is by the court or by a jury. Dunbar testified in effect that he bought the turkeys from Hoerr, paid two and a half cents per pound cash, and gave his note for the balance, and that two or three days after the purchase Hoerr gave him an order (presumably for the turkeys) and he sent it to defendant. On February 5th Dunbar sent defendant a duplicate of his order to plaintiff for lot E 55. Hoerr must have known of the sale to plaintiff, for Dunbar testified that he bought from Hoerr such as he had found market for. Dunbar's note to Hoerr contained a statement after the signature: "Secured by poultry in refrigerators." But we think the inference from Dunbar's evidence is a reasonable one that this clause was not there when the note was signed, and ought not to be accepted as proving a conditional sale, or that right of control and possession had not been given to Dunbar; besides, the clause does not necessarily refer to these turkeys; it may have referred to other poultry. If Hoerr took Dunbar's note in payment, as may be inferred from Dunbar's evidence, and put Dunbar in control of the turkeys by giving him an order for them, I think on a motion for nonsuit the court should have accepted that statement which was most favorable to plaintiff, rather than the other one by Dunbar that it was understood between the two that Dunbar was to pay ten cents per pound as the turkeys were removed. If there was such an understanding, why was the note given at all? Is it not probable that defendant understood the control of the property to have passed to Dunbar since defendant segregated it from the other property of Hoerr and marked it for plaintiff and collected storage from him? Appellant invokes section 1142 of the Civil Code. It provides: "Where the possession of personal property, together with a power to dispose thereof, is transferred by its owner to another person, an executed sale by the latter, while in possession, to a buyer in good faith, and in the ordinary course of business, for value, transfers to such buyer the title of the former owner." I do not understand that the possession mentioned necessarily means actual, exclusive, manual possession. Where the property is in the hands of a bailee, it is sufficient to transfer the right of possession, subject, of course, to the bailee's lien. It seems to us that a fair and reasonable view of the evidence warrants our

holding that this section applies to the case in hand. Respondent contends that plaintiff was not a buyer in good faith, and in the ordinary course of business, because he must be presumed to have known that there was an outstanding receipt issued by defendant which plaintiff ought to have gotten possession of. But we have seen that no such presumption arises from any evidence in the case. Nor is it true that the sale was not executed, for everything was done that Dunbar and plaintiff could do to complete the sale and leave the property with the bailee, which they had the right to do. There was payment; there was the order of Dunbar and its acceptance by defendant, and a segregation of the property from other of Hoerr's property, and a partial delivery agreeably to the transfer. And so, also, was there possession so far as necessary.

This branch of the case is elaborately and learnedly argued by counsel for defendant, occupying the most of a ninety-page brief. It is altogether possible that the facts of the case, if they were all brought out, would show that in law plaintiff ought not to and cannot recover, but we cannot resist the conclusion that defendant should, upon the showing made by plaintiff, be put to its proof. The evidence of Hoerr and the warehousemen may clear away many doubts which now present themselves, and which under the rules of law we feel bound to resolve in favor of plaintiff on the motion.

2. Appellant presents numerous and plausible, and in some respects cogent, reasons for holding defendant to be estopped by its conduct from escaping liability by pleading Hoerr's ownership of the property. We avoid a consideration of this point, although much urged by plaintiff, as we do not wish to forestall its determination at the retrial.

On the whole case, it seems to us that if it had gone to a jury on plaintiff's evidence and a verdict had been rendered for plaintiff, the evidence would have been sufficient to support a judgment upon the verdict, and hence it was error to grant the nonsuit.

The judgment should be reversed.

Gray, C., and Haynes, C., concurred.

For the reasons given in the foregoing opinion the judgment is reversed.        Temple, J., Henshaw, J., McFarland, J.