[Civ. No. 345. Second Appellate District.—June 7, 1907.]

## HERCULES OIL REFINING COMPANY, Appellant, v. GEORGE HOCKNELL et al., Respondents.

CORPORATIONS—LIABILITY OF DIRECTORS—MISAPPROPRIATION OF MONEY BY PRESIDENT NOT PROVED—NONSUIT.—The liability of the directors of a corporation for misappropriation of money by the president of the corporation is limited strictly to money proved to have been misappropriated by him; and in an action by the corporation to enforce such liability, where the evidence fails to show that the president misappropriated any moneys belonging to the corporation, a nonsuit was properly granted.

APPEAL from a judgment of the Superior Court of Los Angeles County. D. K. Trask, Judge.

The facts are stated in the opinion of the court.

E. B. Drake, and Jones & Drake, for Appellant.

A. M. Cates, and George A. Corbin, for Respondents.

TAGGART, J.—This is an action to recover from defendants, as directors of the corporation plaintiff, moneys of the corporation alleged to have been embezzled and misappropriated by an officer of the corporation during the term of office of said directors. The officer who was charged with the misappropriation (defendant Hocknell) was not before the court, but the other defendants appeared and defended, and as to them, and each of them, the court granted a motion for a nonsuit.

Plaintiff appeals from the judgment and presents a bill of exceptions on the ruling of the court granting the nonsuit.

The charge against Hocknell, as president, rests upon the following facts, to wit: On November 25, 1902, the board of directors of plaintiff adopted a resolution authorizing and empowering the defendant, B. L. Vickrey, as secretary of the company, to sell and dispose of all the remaining treasury stock of plaintiff (being 130,000 shares of the par value of $1 per share) at the best price obtainable in the market.

November 26, 1902, thirteen certificates (Nos. 1718 to 1730, inclusive) of said stock for 10,000 shares each, were issued to C. Walton Cannon, a broker in New York City, and forwarded to him for sale. He did not sell any of the stock, but under date of August 31, 1903, an entry was made in the books of the company by the bookkeeper, at the direction of Hocknell, in the name of W. H. Cannon (conceded to be intended for C. Walton Cannon): "To Capital Account, 130,000 shares of the capital stock of Hercules Oil Refining Company, two cents; See Minutes of meeting of Board of Directors, 11, 25, 1902, $2,600.00."

Hocknell procured the stock certificates from Cannon personally while in New York City at least as early as June 15, 1903, and "when he returned from the east" told the secretary of the company that he (Hocknell) had bought the stock at two cents a share and "turned in $2,600 for the stock." He did not say who he bought it from, but the secretary (who was empowered to sell) testified that he considered he (the secretary) had sold the stock to Hocknell at two cents per share, that being the best price obtainable at the time, and because the company needed the money. He further testified: "I felt I was doing the company a favor to get two cents for the stock," and that "there would soon be an assessment on the stock of ten or fifteen cents a share." There was no transfer of any of the Cannon stock to Hocknell on the books of the corporation.

In the latter part of 1902, or the first of 1903, Hocknell sold to Alexander Campbell 25,000 shares of the capital stock of the Hercules Oil Refining Company, and received $5,000 cash therefor. On June 15, 1903, Hocknell forwarded from Ocean Park three certificates of stock, one (No. 1762) for 7,105 shares in the name of George Hocknell, two (1718 and 1719) for 10,000 shares in the name of Walter Cannon. Later, September, 1903, three certificates in the name of Campbell for 5,000, 10,000 and 10,000 shares, respectively, were substituted for the original certificates.

About the same time Campbell purchased, Fred A. Pennell also bought from Hocknell 1,000 shares for which he paid $200 cash, and by letter dated at Ocean Park on June 15, 1903, received a certificate for it in the name of George Hocknell. Later on, September 10, 1903, he received a certificate in his own name in lieu of the Hocknell one.

Thomas B. McPherson, on October 25, 1901, bought 6,250 shares of stock from George Hocknell and paid him $1,250 for them, and again on the twenty-third day of January, 1903, made another purchase of a similar amount for the same price. The first certificates of stock sent to him were in his name; and bore date September 3, 1903. Each block of stock was paid for on the date of its purchase.

Mr. J. W. Hupp bought 10,000 shares of stock from Hocknell and paid $2,000 cash for them, but does not give the date of purchase. The stock certificate was issued in his name and received about September 6, 1903. The circumstances appear to justify the inference that this purchase was made about the same time that Campbell and Pennell purchased.

All of these purchasers bought from Hocknell and knew nothing, apparently, of whether the stock purchased was treasury stock or stock belonging to Hocknell. The evidence does not disclose how much of the residue of the 600,000 shares of the capital stock of the corporation was held or owned by Hocknell, either at the time of sale or the time of delivery of the stock sold by him. The books of the company show that the certificates for the 48,500 shares issued to these four purchasers in their respective names in September, 1903, were all by transfer and cancellation of the Cannon certificates to that amount, and that the residue of the 130,000 shares, 81,500 shares, was sold to one B. M. Frees. The latter sale is not material to this action.

The time at which the secretary accepted Hocknell's declaration that he had bought the stock, at a sale thereof, is stated with much uncertainty in the testimony. "Sometime in July, if I remember correctly," and "after he returned from the east with the stock," cover Mr. Vickrey's recollection of the matter. The letter from Hocknell to Campbell shows he had the Cannon certificates at Ocean Park as early as June 15, 1903, and was assuming to deal with them as his own. There was nothing on the books of the company until August 31, 1903, to show that he (or anyone else) had bought them.

It is admitted that the motion for a nonsuit was properly granted upon the first cause of action, which counted on a participation of the other defendants with Hocknell in the transactions complained of, but appellant claims that there

was a sufficient showing made of the liability of the defendants other than Hocknell, under section 3 of article XII of the constitution of the state of California to avoid the granting of a nonsuit as to such defendants on the second cause of action.

The section of the constitution invoked merely makes the directors sureties for their fellow-directors and for the officers of the corporation for "moneys," when so misappropriated as to make the officer misappropriating liable, and authorizes the creditors and stockholders to sue, etc. The section is not penal in the technical sense, as it allows no recovery as a punishment, but only to compensate for a loss. But the liability created is that of suretyship, in which the innocent always suffers for the guilty, and therefore the surety may always stand upon the very letter of his bond. For this reason the liability must be limited strictly to moneys misappropriated. (*Winchester* v. *Howard,* 136 Cal. 444, [89 Am. St. Rep. 153, 64 Pac. 692, 69 Pac. 77].)

The allegation of the complaint is to the effect that said defendant Hocknell did, on or about January 15, 1903, misappropriate the sum of $8,730 of plaintiff's funds.

The evidence to support this shows that in the latter part of 1902, or the first part of 1903, Hocknell received from Campbell $5,000, from Pennell $200 and from Hupp $2,000. That he received $1,250 from McPherson in October, 1901, and $1,250 in January, 1903. (The October, 1901, payment by McPherson is apparently not included in the sums alleged to have been misappropriated.) At this time the Cannon stock was in New York City in the hands of Cannon for sale, subject to the direction of the secretary of the company. The first connection between Hocknell and this stock appears when he, on June 15, 1903, assumed to send two of the certificates therefor (1718 and 1719) from Ocean Park to Campbell on account of the sales of stock made to the latter about five or six months before. If Vickrey's fixing of dates is correct, the next is when he told Vickrey he had bought the Cannon stock, and the latter accepted him as the purchaser thereof, after his return from the east about July. The circumstances surrounding these transactions might justify a finding that the return mentioned was at least as early as June 15, 1903, thus accounting for the stock being in Hocknell's possession on that date after he had purchased it.

5 Cal. App.—45

Giving the inconsistency between the assumption of owner-ship of the stock by Hocknell, June 15, 1903, and Vickrey's testimony that it was in July, all the consideration rationally possible, and it cannot be said that the trial court should have done more than to hold for the purpose of the nonsuit that Hocknell took control of the Cannon stock as early as June 15, 1903. We find, then, that he sold stock of the Hercules Oil Company at twenty cents in January, and that about five months thereafter he used the treasury stock of the corporation, for which he paid but two cents per share to the company, to make delivery on such sales. The date of the purchase from the secretary was either in June or July, and some uncertainty exists as to whether he made this purchase before or after he had used the stock for the purpose named. This stock was never registered in the name of Hock-nell in the books of the company, but transferred to Hock-nell's vendees upon cancellation of the Cannon certificates, and a record of the purchase of the stock in Cannon's name did not appear upon the books until August 31, 1903.

Conceding that the lack of certainty in the evidence as to the transactions from June to September was sufficient to arouse a suspicion or put the company upon inquiry as to these matters, there is no evidence to justify an inference that the money received in January belonged to the company. At that time the Cannon stock was in New York, Hocknell had no stock of the corporation to sell, and was not author-ized to sell any on the company's account. There was no stock belonging to the company under his control that he could have fraudulently sold. The company could not have been compelled to deliver any stock to make good these sales. There is nothing in the evidence to show that the transactions were anything more than sales by Hocknell for future de-livery made on his own individual account. A misrepre-sentation to his purchasers as to the stock he had or was au-thorized to sell would have been a fraud upon them and not upon the company, and the taking of funds so received would not have been a misappropriation of moneys of the corpora-tion. There is not a scintilla of evidence from which the in-ference can be reasonably drawn that when the sales were made in January, Hocknell expected to acquire the Cannon stock to make delivery therefrom on these sales. If there were, the transaction would have been good as to the com-

pany if it be shown that Hocknell paid the full value of the stock at the time of purchase. The transactions as to the stock after Hocknell's return from the east appear from Mr. Vickrey's testimony to have been carried out in good faith and the company's interest properly looked after, and the full value of the stock at the time of sale obtained. Even the burden put upon accounting trustees was fairly met, and this all appears as part of plaintiff's case. Mr. Vickrey's testimony was uncontradicted and was entitled to, and no doubt did, receive full weight and credit from the trial court in granting the defendants' motion for a nonsuit.

A nonsuit may be granted by the court, upon motion of the defendant, when upon the trial the plaintiff fails to prove a sufficient case for the jury. (Code Civ. Proc., sec. 581, subd. 5.) The rules as to nonsuit are the same whether the trial is by the court or by a jury. (*Freese* v. *Hibernia Sav. etc. Soc.,* 139 Cal. 392, 394, [73 Pac. 172].) The motion admits the truth of all the plaintiff's evidence, and every inference of fact that can be legitimately drawn therefrom, and the evidence should be interpreted most strongly against the defendant. (*Goldstone* v. *Merchants' etc. Co.,* 123 Cal. 625, [56 Pac. 776]; *Hanley* v. *California etc.,* 127 Cal. 232, [59 Pac. 577].) Whatever facts relevant to the issue the evidence tended to prove on plaintiff's behalf must be regarded as proved (*Ferris* v. *Baker,* 127 Cal. 520, [59 Pac. 937]), and the sufficiency or insufficiency of the evidence tending to sustain plaintiff's case cannot be considered. (*Zilmer v. Gerichten,* 111 Cal. 77, [43 Pac. 408].) All of these shadings of the rule, we think, mean simply that a nonsuit should be denied where the evidence, and the presumptions reasonably arising therefrom, are legally sufficient to prove the material allegations of the complaint, and that it should be granted where they are not. (*Goldstone* v. *Merchants' etc. Co.,* 123 Cal. 625, [56 Pac. 776].) To avoid a nonsuit, the evidence of the plaintiff must be sufficient to raise more than a mere surmise or conjecture that the fact is as alleged. It must be such that a rational, well-constructed mind can reasonably draw from it the conclusion that the fact exists. (*Janin* v. *London & S. F. Bank,* 92 Cal. 27, [27 Am. St. Rep. 82, 27 Pac. 1100].)

Measured by these rules, the evidence failed to show any misappropriation of moneys belonging to the plaintiff by Mr. Hocknell, and the nonsuit was properly granted.

Judgment affirmed.

Allen, P. J., and Shaw, J., concurred.