[Civ. No. 428.   Third Appellate District.—August 15, 1908.]

GEORGE H. BUSH, Appellant, v. E. K. WOOD, W. F. STEVENS, and MARKHAM LUMBER COMPANY, a Corporation, Respondents.

NEGLIGENCE—UNSAFE APPLIANCE FOR UNLOADING SAWLOGS—ASSUMP-TION OF RISK—CONTRIBUTORY NEGLIGENCE OF FOREMAN OF MILL—NONSUIT.—In an action by the foreman of a sawmill, who had had long experience as such, for injuries received, by reason of the alleged negligence of the owner of the mill in allowing proper machinery for the descent of sawlogs to the mill to become out of order and unsafe, for want of repair, and in using another unsafe appliance for unloading the sawlogs, by which their descent to the mill became uncontrollable, to his injury, where it appears from plaintiff's evidence, that, with full knowledge of the peril involved, he put himself in the dangerous position of trying to move a log into the mill while others were descending the incline without control, he assumed the risk of his peril, and was properly nonsuited for contributory negligence in not using the care required of a man of his peculiar experience and ability.

ID.—RULE AS TO ASSUMPTION OF RISK—KNOWLEDGE OF UNSAFETY OF MACHINERY USED.—Where a servant works with or in the vicinity

of machinery insufficient for the purposes for which it was employed, or for any reason unsafe, with a knowledge or means of knowledge of its condition, he takes the risk incident to the employment in which he is thus engaged, and cannot maintain an action for injuries resulting from such defective condition of the machinery.

ID.—MOTION FOR NONSUIT—QUESTION OF LAW.—A motion for a nonsuit presents a question of law for the court, and is tantamount to a demurrer to the evidence, or an objection that, admitting all the facts shown in their full probative strength, taken most strongly against the defendant, to be true, such facts do not, in legal effect, entitle the plaintiff to recover.

ID.—LIABILITY OF MASTER TO INFERIOR SERVANT—RULES INAPPLICABLE TO EXPERIENCED FOREMAN.—The rules that if a master knowingly uses defective and unsafe machinery, he is liable to a servant ignorant of its condition, who uses ordinary care, and that he is responsible to servants who rest upon the judgment of their superiors in continuing in service, after the master, with full knowledge of the defectiveness of machinery, omits to repair it within a reasonable time, do not apply to the case of an experienced foreman, who is himself, in some sense, a master, and knows all the contrivances used in the operation of a mill; and is placed in circumstances disclosing to him the absolute necessity for extraordinary care in the use of a dangerous method, after neglect of the master to repair suitable machinery.

ID.—EXCEPTION TO LIABILITY OF MASTER—OBVIOUS DEFECT AND IMMINENT DANGER.—If a defect in the use of machinery is so great that obviously, with the use of the utmost care, the danger was imminent, so much so, that none but a reckless man would incur it, the employer would not be liable.

APPEAL from a judgment of the Superior Court of Sonoma County. Thos. H. Denny, Judge.

The facts are stated in the opinion of the court.

T. J. Butts, and W. F. Cowan, for Appellant.

James W. Oates, for Respondents.

HART, J.—The plaintiff, having sustained personal injuries through the alleged negligence of the defendants, brought this action to recover a judgment for damages therefor in the sum of $25,000. The cause was tried by the court,

a jury having been waived by all the parties, and upon the close of plaintiff's case, and upon motion of the respondents, the court granted a judgment of nonsuit, from which, supported by a bill of exceptions, this appeal is taken.

The complaint alleges that, on the twenty-eighth day of June, 1906, while exercising and performing his duties as "mill" foreman of the Markham Lumber Company, a corporation, which was, and had been for a long time, engaged in the manufacture of lumber, and of which corporation the defendants Stevens and Wood are alleged to be the owners, the plaintiff sustained serious injuries through the operation of defective machinery used in connection with the business of defendants.

It appears from the complaint as well as from the evidence that "sawlogs" which were prepared for manufacture into lumber at the sawmill were carried from the woods by means of cars run upon tracks; that the "cars carrying such logs were run upon such tracks to a point opposite to said sawmill, where said logs were then unloaded and lowered from said car down a steep incline twenty-eight feet to a landing thirteen feet wide, from which landing said logs were rolled by means of a steel wire cable onto a carriage and thereby thence conveyed to the saws in said mill by which the same were sawed into lumber." It is further alleged that prior to the time plaintiff was injured, the manner of unloading the logs from said cars was by means of a steel wire cable operating on a bull-wheel and shafts; that over a month prior to the day on which plaintiff sustained the injuries complained of, the shafting on which said cable and bull-wheel were operated "became dangerous and unsafe for use, and the same could not be used with safety in the customary or any manner, and plaintiff notified defendants that the same was unsafe, but defendants neglected and refused to restore the same, so as it could be used with safety; but on the contrary said W. S. Stevens, as superintendent" of said corporation, "directed one B. Caligari, who was then and there in the employ of said defendants, and wholly under the control and direction of said Stevens as such superintendent, to unload a carload of logs then standing opposite said mill, by rolling said logs from said car down said incline

by means of a pinch-bar and jack-screw, and said B. Cali-
gari, in pursuance of said directions and instructions, and
without the knowledge of plaintiff, proceeded to carry out
said instructions and commenced to unload said logs from
said car by means of a jack-screw and pinch-bar and roll the
same down said incline on to said landing." At the time of
the accident, and just before Caligari commenced to unload
the logs from the car, plaintiff was engaged in fastening the
cable around a sawlog, then resting on the landing, "for the
purpose of rolling said log on to the carriage for conveyance
to the saws," and while plaintiff was thus engaged, said
Caligari, so the complaint avers, "without notice or warn-
ing to plaintiff, unloosened and allowed several of said logs
to roll from said car down said incline with great force, and
one of said logs, about 22 feet in length and thirty inches in
diameter, and weighing about 1500 pounds, rolled down said
incline with great force and struck plaintiff with great
violence," fracturing the bones of his left leg in four differ-
ent places, one of said fractures being above and three below
the knee, and also dislocating the knee-cap. It is further
alleged that the effect of the injuries thus received was to
render plaintiff for many months thereafter incapable of
performing his ordinary duties as a sawmill foreman, in which
capacity in various sawmills he had been employed for many
years, etc., and that he will permanently suffer from said in-
juries.

After the plaintiff had put in all his evidence, the court,
upon motion of the defendants, granted a nonsuit, and the
only question presented upon this appeal is, therefore, whether
the court was, under the evidence adduced by plaintiff, jus-
tified in allowing the motion therefor.

The defendants specified a number of apparently different
grounds upon which they asked that plaintiff be nonsuited,
but they all in effect amount to the contention that plain-
tiff, by his own testimony, discloses that his injuries were
received through his own negligence, and not through that
of the defendants.

A motion for nonsuit presents a question of law for de-
termination by the court. The motion is tantamount to a
demurrer to the evidence, or an objection that, admitting all

the proved material facts to be true, said facts do not in legal effect operate in favor of the plaintiff, or, in other words, do not entitle him to the relief asked for by him. (*Goldstone* v. *Merchants' Ice etc. Co.*, 123 Cal. 625, [56 Pac. 776] ; *Wasserman* v. *Sloss*, 117 Cal. 425, [59 Am. St. Rep. 209, 49 Pac. 566; *Non-Refillable Bottle Co.* v. *Robertson, ante,* p. 103, [96 Pac. 324] and cases therein cited.)

It is also one of the settled rules governing a motion for a nonsuit upon the close of plaintiff's case that the evidence, whether erroneously admitted or not, if relevant to the issues joined, must be given by the court the benefit of its full probative strength, and that any question arising from the fact of variation between the evidence of the witnesses cannot be raised or considered. (*Wasserman* v. *Sloss*, 117 Cal. 425, [59 Am. St. Rep. 209, 49 Pac. 566] ; *Archibald's Estate* v. *Matteson*, 5 Cal. App. 441, [90 Pac. 723], and cases therein cited.) It is also true that on motion for a nonsuit the evidence must be taken most strongly against the defendant (*Goldstone* v. *Merchants' Ice etc. Co.*, 123 Cal. 625, [56 Pac. 776]), and if the plaintiff has introduced proof sufficient to make out a *prima facie* case under the allegations of his complaint, the motion, if made on the close of his case, should be denied. (*Janin* v. *London etc. Bank*, 92 Cal. 14, [27 Am. St. Rep. 82, 27 Pac. 1100] ; *Non-Refillable Bottle Co.* v. *Robertson, ante,* p. 103, [96 Pac. 324] ; *Archibald's Estate* v. *Matteson*, 5 Cal. App. 441, [90 Pac. 723].)

From the foregoing it is clear that it makes no difference, where the motion for a nonsuit is made on the close of plaintiff's case, whether the court itself believes the testimony presented or not, for, as is obvious, the material facts which the evidence tends to prove must be assumed to be true for the purposes of the motion, just the same as the material facts alleged in a pleading must be so treated in the consideration of a demurrer to such pleading. It is scarcely necessary to suggest that the situation as to the last-mentioned proposition is somewhat different where a motion for a nonsuit is made after all the testimony for both sides has been put in—that is to say, it is a well-established rule that the trial court may, in the exercise of its discretion, grant a motion for a nonsuit, made at the close of the evidence for both plaintiff

and defendant, "where, upon all the evidence, it is clear that if a jury should bring in a verdict against the defendant it would be the duty of the court to set it aside and order a new trial." (*Estate of Morey,* 147 Cal. 507, [82 Pac. 57], and cases therein cited.)

Having thus stated some of the rules by which the courts must be guided in the determination of the disposition which should be made of a motion for a nonsuit, we will now, by the light of those rules, proceed to examine the evidence produced by the plaintiff to ascertain whether, in our opinion, the court below erred in its ruling on the motion in the case at bar. It may be premised that, if the evidence presented by plaintiff discloses that he was himself guilty of negligence which proximately contributed to the accident in which he sustained the injury of which he complains, then, of course, the ruling of the court on the motion was proper, and should be upheld.

The testimony of the plaintiff, who was the only witness who testified concerning the circumstances immediately attending the accident causing his injury, shows these facts: That plaintiff, up to the time of the accident, had had about five years' experience as a foreman of lumber-mills, having worked at other mills prior to his employment by the defendants; that he had, when the accident occurred, worked in that capacity for defendants for about a year; that the defendant Stevens, who was general superintendent of the corporation defendant, employed him; that his duties were, to use his own language, "to keep the mill going"; that when the mill became "short a man"—that is, when one of the employees became incapacitated temporarily or left the service of the corporation permanently, it was the duty of plaintiff to take the place of such man until the latter was restored to capacity or another man procured to discharge the particular duties of the position; that one Caligari was, on the day of the accident, operating the tramway or railroad used for the purpose of conveying large sawlogs from the "lumber camp" to a point forty feet from the mill; that at this point Caligari would unload the logs so that they would descend a twenty-six foot incline to the "landing," from where they were conveyed to the sawmill; that prior to the tenth or eleventh day of May, 1906, the logs were unloaded from the

logging-car by a bull-wheel and cable operated by means of
levers, and that when the logs were thus unloaded the man
on the car put the cable over the log while yet on the car
and then signaled the man who worked on the landing and
who started the bull-wheel by the manipulation of the levers;
that there was comparatively little danger incident to the
unloading of the logs in the manner thus briefly described;
that on or about the eleventh or twelfth day of May, 1906,
the bull-wheel and shaft used for the purpose of unloading
the logs got out of order so that they could not be used; that
thereafter and until and including the twenty-eighth day
of June, 1906, on which day the plaintiff was injured, the
work of unloading the logs from the car was conducted by
means of a pinch-bar and a jack-screw—that is, the man on
the car would, when necessary, raise the logs above the level
of the car with the jack-screw and then throw them off by
means of the pinch-bar, so that they would slide down the
incline to the landing, a distance of twenty-six feet; that this
method of unloading the logs was more dangerous than un-
loading them by means of the bull-wheel and cable, and
that plaintiff knew that there was increased danger and risk
in thus unloading them; that on the day of the accident
the man who had been accustomed to attending to the duty
of receiving the logs at the landing and thence conveying
them to the mill had given up his position, and the plaintiff,
in pursuance of his duties as foreman, was at the landing in
his place for the purpose of performing said duty. Plaintiff
testified that on several different occasions he spoke to Ste-
vens, the superintendent, about the condition of the bull-
wheel, and requested him to have it repaired; that he told
Stevens several times that it was "unsafe to operate that
bull-wheel with the machinery that he had there; asked him
to shut the mill down, and he says, 'Oh, no, we can't do
that; we will have to keep going,'" The plaintiff then de-
scribed the manner in which he was injured as follows:

"There was just one log on the landing, everything cut
up and just one, just one log on the landing, and I had a
piece of old wire cable there, we couldn't get nothing, and I
was putting that piece of old wire cable, I should judge about
twenty feet long, around a log to connect it with the bull-
wheel to take it to the carriage to saw it up in boards, and

while I was passing this wire cable around there, these logs were turned loose upon the car with the pinch-bar and jackscrews without me having any warning whatever, and my leg was broken in four places, and a dislocation of the kneecap.

"Q. Was there anybody there whose duty it was to fasten this cable around the logs and put them on the carriage so they could go into the saw? A. No; there was nobody there, I had to do it.

"Q. If you hadn't done it, it would not have been done? A. No, sir; it would not have been done.

"Q. And that was the only log there was on the landing? A. Just the one; I simply put in the wire cable around so they could connect it and take it to the carriage.

"Q. Did you have any warning when these logs came down? A. No, sir, none whatever.

"Q. Do you know how many came down? A. I think two and possibly three, because a man using a pinch-bar on a lot of logs you can't really tell sometimes where they are going or how many comes down, but there was two came down anyhow on me, for after I fell to the ground I recognized there was two logs there."

On cross-examination the plaintiff repeated that he knew it was much more dangerous to unload the car with a pinch-bar than by means of the bull-wheel and cable, for by the former method the logs were liable to go in any direction—that is, they would not likely remain while descending the incline in the track over which it was intended they should roll down to the landing, as they would by the bull-wheel and cable, and, therefore, one would have to be on his guard more; that the man at the car, when unloading the logs by means of the bull-wheel, could and would give a signal warning to the man at the landing, and thus give him an opportunity to avoid collision with the logs.

The witness Howard, who was a section-hand on the railroad, testified that there was more danger of accident by unloading the logs with the jack-screw and pinch-bar than with the bull-wheel and cable. Caligari also so testified. This witness said that from the car, from which he unloaded the logs, he could plainly see the man at the landing, and that he knew of no reason why the man at the landing could

not see him.   He further testified that he requested Stevens several times to have the bull-wheel repaired so that it could be used.

The foregoing represents a fair epitome of all the testimony given on behalf of plaintiff and upon which the court below granted the nonsuit.

We think the nonsuit was properly ordered, for we are of the opinion that plaintiff shows by his own testimony that but for his own negligence the injuries he sustained would not have been received.   He was a man of experience as a foreman of lumber-mills, and certainly if he were not possessed of more than ordinary ability and intelligence in the line of the duties of the position he occupied, he would not have been invested with the responsible authority and duties of so important a position.   Men who are selected to immediately oversee and direct the operations of a business of the importance and magnitude of a sawmill in which large quantities of lumber are manufactured are, ordinarily, so selected because of their peculiar experience and ability in that line of activity.   Where a man may not be so employed upon the considerations suggested, the exception, and not the rule, is encountered.   The plaintiff in the case here claims to be, and no doubt is, a capable person in the position of foreman and director of such a business.   His own testimony shows that he was aware of the defective condition of the machinery with which the logs were conveyed from the car to the "landing" for over a month prior to the day on which he was injured, and it also shows that he knew that the unloading of the logs by means of the jack-screw and crow-bar involved increased risk and danger of accident.   Notwithstanding this knowledge, he undertook the work of receiving the logs at the "landing," and in so doing assumed, we think, whatever additional risk might be involved in the discharge of that duty under those circumstances.

The rule is well stated in *McGlynn* v. *Brodie,* 31 Cal. 380, as follows: "Where a party works with, or in the vicinity of a piece of machinery insufficient for the purposes for which it was employed, or for any reason unsafe, with a knowledge or means of knowledge of its condition, he takes the risk incident to the employment in which he is thus engaged, and cannot maintain an action for injuries sustained arising out

of accidents resulting from such defective condition of the machinery.''

Of course, it is the duty of the employer to use all reasonable precautions for the safety of those in his service. ''He should provide them with suitable machinery, and see that it is kept in a condition which shall not endanger the safety of the employed. If the employer knowingly make use of defective and unsafe machinery, when an injury is done to a servant *ignorant of its condition and in the exercise of ordinary care,* he should compensate the person thus injured through his neglect.'' (*Buzzell* v. *Laconia Man. Co.,* 48 Me. 113, [77 Am. Dec. 212], and cases therein cited. See, also, footnotes in last citation.)

We have not, in the consideration of the question here, measured by the circumstances under which plaintiff's injuries were received, overlooked the long line of cases holding that a master will be responsible to his servant who, having full knowledge of the defectiveness of the machinery, and while exercising due care, sustains injuries through the operation of such defective machinery, where the master has previously been made cognizant of such defectiveness and has omitted to repair such machinery within a reasonable time after such notice. (*Patterson* v. *Pittsburg etc. R. R. Co.,* 76 Pa. St. 389, [18 Am. Rep. 412] ; *Hough* v. *Railway Co.,* 100 U. S. 213; *Parody* v. *Chicago etc. Ry. Co.,* 15 Fed. 205; *Buzzell* v. *Laconia Man. Co.,* 48 Me. 113, [77 Am. Dec. 212].) The principle, however, upon which it is held that the master is liable under the circumstances mentioned proceeds upon the theory that the servant, although fully aware of the increased danger of his employment growing out of the defectiveness of the machinery, ''rests upon the judgment of his superiors, who requested him to continue its use, hoping that by extra care and skill he might avert accidents'' until the machinery is properly repaired. (*Patterson* v. *Pittsburg etc. R. R. Co.,* 76 Pa. St. 389, [18 Am. Rep. 412].) Or, as it has been expressed in another jurisdiction, ''it is, in most cases, impossible that a workman can judge of the condition of a complex and dangerous machine, wielding irresistible mechanical power, and, if he could, he is quite incapable of estimating the degree of risk involved in different conditions of the machine; but the master may be able, and generally is

able, to estimate both. . . ." (*Clarke* v. *Holmes,* 7 Hurl. & H. 937.)

But, as we have seen, we have here a man who, in one sense of the term, was himself a master; a man who was an experienced mill foreman, thoroughly familiar, presumably, with all the mechanical contrivances and operations of the mill, and who, according to his own testimony, keenly appreciated and realized the added risk and danger incident to the unloading of large sawlogs and their precipitation down an incline by means of a pinch-bar. The fact, of which he undertakes to make much to his own advantage and in support of the claims of his complaint, that under the regular or proper method of unloading the logs there was a way, habitually practiced, in which a signal warning was given him by the man at the car when the logs were started down the incline, and that no such signal could be given, where the logs were sent down from the car with a pinch-bar, is itself a strong circumstance disclosing the absolute necessity for the exercise of extraordinary care on the part of the man at the landing in the discharge of his duties there under the pinch-bar method of unloading the car. While the testimony shows that Stevens was the general superintendent of the plant and the business and employed plaintiff, it also shows that plaintiff had immediate management and control of the operation of the mill, and possessed knowledge of the effect of unloading the logs with a pinch-bar equal if not superior to that of Stevens. There is, therefore, no reason or room for the application of the principle we have been discussing to the facts of this case. If plaintiff were an ordinary workman, without special experience as a lumber-mill man, occupying only an ordinary position at the mill, itself not carrying or involving duties requiring special or more than ordinary skill, there might then be reason for holding the master liable after he had been apprised of the defect in the machinery, rendering it unusually dangerous, it appearing that plaintiff had exercised, in the performance of the duties of his employment when the accident occurred, the care demanded by the new circumstances created by the defectiveness of the machinery. But the rule of which we are speaking has this qualification: "If the defect was so great that, obviously, with

8 Cal. App.—42

the use of the utmost skill and care, the danger was imminent, so much so, that none but a reckless man would incur it, the employer would not be liable." (*Patterson* v. *Pittsburg etc. R. R. Co.*, 76 Pa. St. 389, [18 Am. Rep. 412].)

The plaintiff declared as a witness that where the logs were thrown down the incline without the use of the cable, there being then no means by which they could be controlled after they left the car, they were likely to go down the incline in a haphazard manner, or not remain within the track over which they would otherwise pass. Therefore, an experienced person at the landing, having full knowledge of the increased hazard to which he was subjecting himself, would be charged with the exercise of unusual caution and alertness in the performance of the service he was thus engaged in. It was the duty of plaintiff, under the circumstances, to have been constantly on his guard so as to prevent damage which he might reasonably have anticipated would otherwise occur. Failing to do so, the injuries he sustained were, consequently, due wholly to his own fault, and he cannot, therefore, fasten liability therefor upon the defendants. In other words, viewing the testimony in the strongest and most favorable light to plaintiff's contention, as it is our duty to do, we think, as it has been our purpose to make clear, that it shows that the accident and consequent damage would not have occurred but for his own culpable negligence.

There is no evidence in the record disclosing negligence upon the part of Caligari, who was a fellow-servant, and hence the discussion in the briefs relative to the alleged liability of the defendants for the negligence of a coemployee of plaintiff need not be noticed.

The judgment, for the reasons herein given, is affirmed.

Chipman, P. J., and Burnett, J., concurred.