[L. A. No. 3226. Department Two.—March 21, 1914.]

W. T. WHEATLEY et al., Appellants, v. CONSOLIDATED LUMBER COMPANY (a Corporation), Respondent.

Submerged Land—Ownership by State—Lease by Municipal Corporation.—Where land along and under the ocean is owned by the state by virtue of its sovereignty, an attempted lease thereof by a municipality which has undertaken to incorporate the land within its territorial limits is void.

Id.—Conflicting Leases—Curative Statute—Lease Prior in Time.— If two neighboring municipalities both undertake to annex such land, and both of them attempt to lease it, the lease prior in time is validated under the Curative Act of 1907 (Stats. 1907, p. 987).

APPEAL from a judgment of nonsuit of the Superior Court of Los Angeles County. J. D. Murphey, Judge presiding.

The facts are stated in the opinion of the court.

T. E. Gibbon, Oscar C. Mueller, W. W. Middlecoff, and H. S. Wilson, for Appellants.

Frank D. McClure, Sheldon Borden, and George H. Moore, for Respondent.

HENSHAW, J.—San Pedro is an incorporated city possessing a water frontage upon the harbor of the same name. To the south of San Pedro is the incorporated city of Long Beach. Between the two was a strip of upland not within the corporate limits of either town. This upland has an ocean frontage. When the United States government became active in its work of developing the harbor of San Pedro the two municipalities became inspired with the same idea—that of

annexing the upland referred to and a part of the contiguous territory under the waters of the ocean. A petition for the annexation of this territory to San Pedro was filed July 5, 1905. The ordinance of the San Pedro trustees was adopted July 18, 1905, calling for an election upon August 30, 1905. The petition for annexation to Long Beach was filed July 17, 1905; the ordinance called for an election upon August 16, 1905; the returns were canvassed on August 21, 1905; the certificate of annexation was filed August 22, 1905—all prior to the date of the San Pedro annexation election. In due course the San Pedro annexation election was held and its certificate of annexation duly filed. Both municipalities claimed jurisdiction over the annexed territory. It will be noted that while the formal annexation of the territory to Long Beach was completed before the holding of the San Pedro election, the initiatory step by petition for annexation to San Pedro was taken before Long Beach had made its first move in this respect. Much litigation grew out of this condition of affairs. The case of *Haskell* v. *Long Beach,* attacked the annexation to that city upon certain grounds. The annexation was upheld by the superior court of Los Angeles County, whose decision was affirmed by this court. (*Haskell* v. *Long Beach,* 153 Cal. 543, [96 Pac. 92].) This decision was handed down in May, 1908, but before that, upon March 30, 1907, another action in *quo warranto* had been instituted. In this action, at the instance of the state, judgment was rendered holding the annexation to Long Beach to be illegal, and that decision was affirmed upon appeal to this court in June, 1909. (*People ex rel. Scholler* v. *Long Beach,* 155 Cal. 604, [102 Pac. 664].) During the progress of this litigation there can be no doubt but that the city of Long Beach exercised, or attempted to exercise, municipal control over the disputed territory.

The San Pedro, Los Angeles and Salt Lake Railroad Company owned portions of the upland in the disputed territory and applied for and obtained from the city of Long Beach, in October, 1905, a lease to certain of the contiguous submerged lands of the ocean. This lease was for an insignificant cash rental, but imposed the condition upon the railroad company of building an inclosing bulkhead and filling in the leased land—conditions involving a great expenditure of money.

(See *San Pedro etc. R. Co.* v. *Hamilton,* 161 Cal. 610, [37 L. R. A. (N. S.) 686, 119 Pac. 1073].)   Nearly a year after the Long Beach lease was thus obtained by the Salt Lake railroad, plaintiff Wheatley secured from the city of San Pedro a lease well nigh identical in terms and to practically the same lands.   Wheatley was at the time, and continuously thereafter, the active manager of the defendant lumber company.   A majority of the stock of the lumber company was owned by the Charles Nelson Co., of which company James Tyson was the general manager.   Percy R. Wilson, an attorney at law, was a director and the vice-president of the defendant lumber company.   Tyson and Wheatley were directors.   Wilson was also the attorney for the company.

The present action is founded upon the following claims and contentions of Wheatley: That he was the sole owner of the lease from the city of San Pedro and that he conveyed an undivided one-third interest in it to Tyson and another one-third interest, for legal services to be rendered, to Wilson; that subsequently the three conveyed their interests to the defendant lumber company; that the defendant lumber company, in accepting the assignment, became liable for the value of the lease; that this lease was valid and of the value of three hundred and fifty-eight thousand dollars.   The action is brought to enforce this payment.   Wilson is dead and his claims are represented by his executors.   Tyson repudiates the claims and contentions of Wheatley.   At the trial both sides introduced their evidence, whereupon the court granted a nonsuit. The soundness of its ruling in this regard is the question upon this appeal.

This discussion will proceed under the well settled rules governing the granting of nonsuits as laid down in *Zilmer* v. *Gerichten,* 111 Cal. 73, [43 Pac. 408]; *Goldstone* v. *Merchants Ice & Cold Storage Co.,* 123 Cal. 625, [56 Pac. 776]; *Hanley* v. *California etc. Co.,* 127 Cal. 232, [47 L. R. A. 597, 59 Pac. 577]; *Estate of Arnold,* 147 Cal. 586, [82 Pac. 252].

The Salt Lake railroad, acting under the Long Beach lease, diligently and at great expense prosecuted the work of reclamation called for by that lease.   Neither Wheatley nor any one else did anything under the San Pedro lease.   On March 23, 1907, the legislature passed a curative and validating act affecting these leases, which will be matter for later considera-

tion. (Stats. 1907, p. 987.) While Wheatley, thus asserted ownership of the San Pedro lease, it is made to appear that every dollar spent in the procurement of it and the rental after its procurement was paid by the company and was by him charged on the books of the defendant lumber company, of which he was manager, to that company, and that every man whose services were engaged in the procurement of the lease was an officer or employee of the company. After this lease had been in existence for a little over a year, with nothing done under it, Mr. Wilson, the attorney for the company (so testifies Mr. Tyson) advised him and Mr. Wheatley that because of their relations with the company and the fact that the company's money had been expended in procuring the lease, and because Wheatley was the manager of the company, and because the company had itself been desirous of obtaining this ocean frontage for the convenient and less expensive handling of its lumber, they could not with propriety or right lay any claim to the ownership of the lease, and, standing in Wheatley's name, as it did, it should be formally made over to its real owner—the defendant lumber company. This the three not only agreed to do, but this they did do by formal declaration to the board of directors. In a letter of October 17, 1907, Wheatley writes to Tyson: "We have decided to put the entire proposition into the Consolidated Lumber Company. In other words, the applications are all in my name, as well as the lease we have already obtained; but whatever comes up, it will belong to the Consolidated Lumber Company. We believe this is the best proposition, and we think you will agree with us," to which Tyson replied: "Note you have also concluded to turn the whole matter into the Consolidated Lumber Company, which is entirely satisfactory, so far as I am concerned." Furthermore, Mr. Tyson testifies that it was to be turned in to the Consolidated Lumber Company at actual cost, which actual cost amounted to but a few hundred dollars, and, as has been said, had been paid by the Consolidated Lumber Company, as appears by its books contemporaneously kept under the management and direction of Wheatley. Thereafter the Consolidated Lumber Company secured a lease from the railroad Company of certain of the railroad company's lands near Wilmington, upon the inner bay of San Pedro harbor. The lease was to a large tract of land and in-

volved upon the part of the lumber company great expense in dredging. It performed this work. In these transactions between the lumber company and the railroad company, the lumber company assigned to the railroad company its interest in the San Pedro lease. The negotiations of the lumber company were carried on by Wheatley. The testimony of Mr. Clark, vice-president of the railroad company, and acting for it, is that the offer to assign the San Pedro lease to the railroad company was a voluntary offer made by Wheatley; that it was in no sense a condition exacted or imposed by the railroad company to their granting of the lease of the Wilmington land to the lumber company. Mr. Clark's testimony is that it became a part of the transaction only after Wheatley's voluntary offer. "He offered to do it, and the clause was put into the lease providing it should be done by the Consolidated Company." As establishing the value of this San Pedro lease, plaintiffs argue in effect that it was the sole consideration for the lease which the railroad company made to the lumber company for the Wilmington lands; that the lumber company paid out for the dredging and reclamation of these lands the sum of one hundred and forty thousand dollars; leased twenty acres of them to the Pacific Lumber Company for three hundred and thirty-two thousand dollars, retaining ten acres, whose leasehold value is one hundred and sixty-six thousand dollars, thus making a profit of three hundred and fifty-eight thousand dollars by the transfer to the railroad company of the San Pedro lease. Some years passed after the transactions thus indicated, and neither Wheatley nor Wilson ever made any claim to reimbursement for the asserted value of this lease. Neither did Tyson. But the time came when Wheatley severed his connection with the lumber company and before doing so caused the bookkeeper to prepare a statement showing the amount from the books of the company which had been paid in connection with the San Pedro lease, including the monthly rental. He then gave to the bookkeeper, who was acting under his orders and instructions, the amount which the lumber company had so expended, thus seeking at that late date to put himself in the position of having paid for the lease.

This sufficiently indicates the true nature of the dealings of the parties. While in many respects the evidence overwhelm-

ingly indicates that the defendant was the owner of the lease, that whatever pretenses to ownership Wheatley may have made in the first instance he abandoned them absolutely, yet it may not be said that all of this evidence is without conflict, since Wheatley unhesitatingly denies wherever denial is possible.

There is one consideration, however, over which there can arise no conflict of evidence, and which is determinative of the controversy. If in fact and in law the San.Pedro lease was not a valid lease, then Wheatley conveyed nothing, and to this consideration we may immediately come. At the time and after the attempted annexation by the two municipalities and their subsequent attempts to lease this part of the bed of the ocean, the leased lands were owned by the state of California by virtue of its sovereignty. Annexation gave neither of these municipalities any ownership in or right to lease this submerged land. It was not only held in ownership by the state, but only a limited dominion and control over it were vested in the legislature under the restriction of the constitution. (Const., art. 15, sec. 3.) Merely incorporating the land within the territorial boundaries of the municipality gave these cities no more power to lease the land than it would have given them the power to lease the land of a private owner. These statements are so indisputably true that we need not linger over amplifications of them. It therefore follows that both leases were valueless and void and that what validity either of them received came alone from the Validating and Curative Act of the legislature. In 1907 the legislature passed such an act. It declared as follows:

"In all cases in which any county or municipality in the state of California has, prior to the first day of January, 1907, leased to any person or persons any tide or submerged lands belonging to the state, within the municipal boundaries of such county or municipality, or within boundaries over which it was at the time of any such lease acting in the exercise of *de-facto* authority, the exclusive right to the use and possession of such lands from the date of such lease, for the full term thereof, not exceeding fifty (50) years in any case, is hereby confirmed in the lessee or lessees thereof and their successors in interest; and priority in date of any such leases shall give priority in right; *provided,* that nothing in this act con-

tained shall be deemed or taken to confirm any such leases, unless the property therein described shall at all times during the continuance of such leases be applied by the lessees, or their successors in interest, to public or *quasi* public uses; and *provided further*, that within one (1) year from the date this act shall take effect said lessee or lessees, or their successors in interest, shall commence in good faith the improvement of said premises for the purposes aforesaid and shall prosecute the same to completion with reasonable diligence.''

The act went into immediate effect. With elaborate argument and the citation of numerous authorities, appellants contend for the validity of the San Pedro lease, because, as between the two municipalities, that one first acquired jurisdiction which first initiated proceedings to that end. (*State* v. *Clark*, 21 N. D. 517, [131 N. W. 715]; *People* v. *Morrow*, 181 Ill. 315, [54 N. E. 839].) San Pedro was thus first in the field. Therefore, regardless of the subsequent decision of this court in the Scholler case, declaring the annexation to Long Beach to be invalid, the disputed territory was never within the corporate limits of Long Beach, but, by virtue of the San Pedro election, came within the corporate limits of that municipality. Next appellants declare that it is the general rule that a municipal corporation can exercise its corporate power only within the city limits. (20 Am. & Eng. Ency. of Law, pp. 1148, 1150; 3 Thompson on Corporations, sec. 3898.) Further it is said that it is a self-evident proposition that two independent governments cannot exercise the same powers within the same district at the same time. (*Taylor* v. *City of Fort Wayne*, 47 Ind. 281; *State* v. *Blossom*, 19 Nev. 312, [10 Pac. 430].) There cannot be a *de facto* officer unless there be a *de jure* office to be filled. (*People* v. *Toal*, 85 Cal. 333, [24 Pac. 603].) There cannot be two *de facto* incumbents of a single office, and where two are exercising or attempting to exercise the functions of a single office, that one alone will be recognized who has the legal right. (*McKannay* v. *Horton*, 151 Cal. 717, [121 Am. St. Rep. 146, 13 L. R. A. (N. S.) 661, 91 Pac. 598].) In governmental affairs to constitute a *de facto* officer there must be a legal government. "A *de facto* officer of an illegal or unlawful government is an anomaly that can only exist in absurdity.'' (*Penn* v. *Tollison*, 26 Ark. 545; *Smith* v. *Stewart*, 21 La. Ann. 67, [99 Am.

Dec. 709].) To this line of reasoning and to these author-
ities we need not and do not take the slightest exception.
They do not, however, in any respect meet, much less con-
trol, the conditions of this case. Here two municipalities,
neither of which had the slightest right to make the lease, even
though the land were within its corporate limits, have under-
taken to lease the land owned by the state. The situation is
legally no different, as has been said, from that which would
have been presented if, in like manner, they had undertaken
to lease the land of a private owner. Neither lease was valid,
and if either was validated that validation came only through
the express sanction of the owner. It was within the power
of the owner to validate either or none. The question is which
one did the state validate? and that is to be determined by
the language of the Curative Act. What the state did say in
this regard was, that in every case where a municipality has
leased such submerged lands belonging to the state "within
boundaries over which it was at the time of any such lease
acting in the exercise of *de facto* authority," such lease is
declared valid under certain terms and restrictions. And if—
proceeds the act—question and dispute shall arise between
conflicting leases, "priority in date shall give priority of
right." By these terms, then, are presented no questions of
*de facto* sovereignty—of one municipality attempting to exer-
cise municipal control of territory within the *de jure* limits
of another municipality—no question of scrambling possession
between two officers and the *de jure* right drawing to it the
*de facto* occupancy. To the contrary, the act expressly recog-
nizes that conflicting leases may have been made by different
municipalities and declares which lease, when that fact is
shown to exist, the state will accept as valid. As to the
making of the lease, it is a lease which shall have been made
by a municipality of submerged lands, "within boundaries
over which it was at the time of any such lease acting in the
exercise of *de facto* authority." *De facto* authority here
means, and can only mean, authority exercised in fact, with-
out regard to the law. Neither municipality had authority in
law to execute the lease. The very execution of it was the
exercise of authority in fact, of the *de facto* authority which
the statute mentions. In other words, it was the exercise of
an authority in fact to make the lease, which authority in law

did not exist, and it was made within boundaries over which at the time it may not be questioned that Long Beach was asserting authority. This being the legal question presented, and there having been two conflicting leases made by the two municipalities under the indicated circumstances, the statute itself answers the remaining question. That one alone is valid which is prior in time and that one is, without question, the Long Beach lease. For these reasons it is established that, conceding everything which may be claimed by appellant under his contention of conflict of evidence, one indisputable fact remains—which is that the San Pedro lease was invalid and valueless and the nonsuit was therefore properly granted.

The judgment appealed from is therefore affirmed.

Lorigan, J., and Melvin, J., concurred.

Hearing in Bank denied.