[L. A. No. 4284. Department Two.—February 18, 1916.]

In the Matter of the Estate of SHAOPIN CASPAR, Deceased; SAHMIN BABIK, Appellant, v. EMILY AINLEY, Respondent.

CONTEST OF WILLS—RULES OF EVIDENCE SIMILAR TO THOSE IN OTHER CIVIL ACTIONS—WEIGHT AND SUFFICIENCY.—The rules of evidence and the weight to be accorded to the evidence are the same in a contested will case as in any other civil case, and those rules apply when the question goes to the sufficiency of the evidence to justify its submission to the jury.

ID.—EVIDENCE—DUTY OF TRIAL COURT TO SET ASIDE VERDICT IF CONTRARY TO WEIGHT OF EVIDENCE.—In this state, though the evidence *pro* and *con* upon the issues be substantial and conflicting, it is the duty of the trial judge to set aside a verdict at least once if his conviction is that the verdict is contrary to the weight of the evidence and oftener if he is impressed with its injustice.

ID.—VERDICT DIRECTED IN SAME CASES AS NONSUIT GRANTED.—The right of a court to direct a verdict is, touching the condition of the evidence, absolutely the same as the right of the court to grant a nonsuit.

ID.—WHEN PROPER TO GRANT NONSUIT.—The court may grant a nonsuit only when, disregarding conflicting evidence and giving to plaintiff's evidence all the value to which it is legally entitled, herein indulging in every legitimate inference which may be drawn from that evidence, the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of plaintiff if such a verdict were given.

ID.—DUTY OF COURT TO SET ASIDE VERDICT.—If no motion for a nonsuit has been made and the issues have been turned over to the consideration of the jury, and that jury has rendered a verdict in favor of plaintiff, such verdict being unsupported by any substantial evidence, it becomes the imperative duty of the court to set it aside.

ID.—DUTY OF COURT TO GRANT NONSUIT OR DIRECT A VERDICT.—When, and only when, the evidence of the proponent could not give substantial support to a verdict in favor of proponent, the court may and should grant a nonsuit, and may and should direct a verdict.

ID.—RULE AS TO DIRECTED VERDICTS.—The rule as to directed verdicts is not that a verdict may be directed whenever the evidence is such that upon motion the court would grant a new trial, for the court may grant a new trial even when there is substantial evidence to sustain the verdict, if it believes that the evidence preponderates against the verdict, but a verdict should be directed whenever upon

the whole evidence the court would be compelled to set aside a contrary verdict as unsupported by the evidence.

ID.—WHEN IMPROPER TO GRANT A NONSUIT OR TO DIRECT A VERDICT.— In a contest to revoke the probate of a will, if the contestant presented evidence such that notwithstanding the conflict raised by proponent's evidence it would support a verdict in favor of contestant, it would be error for the court to grant a motion for a nonsuit or to direct a verdict.

ID.—IN CASE AT BAR DIRECTED VERDICT HELD ERRONEOUS.—In this case the evidence of the contestant is held to be of such weight and substantiality that, notwithstanding the evidence of the proponent, there was a substantial conflict of evidence upon the soundness of mind of the testator, and the question of undue influence, and it was error for the trial court to direct a verdict in favor of the proponent, but, on the contrary, the trial court should have submitted the cause to the jury.

APPEAL from a judgment of the Superior Court of Los Angeles County. Frederick W. Houser, Judge.

The facts are stated in the opinion of the court.

Joseph L. Lewisohn, Daniel M. Hunsaker, J. Henry Harris, Hunsaker & Britt, and Hunsaker & Harris, for Appellant.

D. H. Laubersheimer, and Trippet, Chapman & Biby, for Respondent.

HENSHAW, J.—Shaopin Caspar died testate in the county of Los Angeles and his will was probated. Appellant, Sahmin Babik, as his cousin and one of his heirs at law, instituted this contest to revoke the probate of the will. Trial was had before a jury and the issues were submitted to that jury for determination. They were all found in favor of the contestant. Subsequently the court set aside the verdict of the jury on the ground of insufficiency of the evidence to sustain it. A second trial was had before a second jury and the evidence presented to that jury was (under stipulation) precisely the same evidence which had been considered by the former jury. Upon motion of the proponent the court directed the second jury to find all of the issues in favor of the proponent, with the exception of the issue of relationship. The jury so found. Judgment thereupon was entered affirming the probate of the will and the petition to revoke that probate was dismissed.

This appeal is taken from the judgment so rendered, and it involves a consideration of the correctness of the court's ruling in directing a verdict. Necessarily, it demands a presentation of the evidence relied upon by contestant, which presentation will in due course be made in as brief terms as possible.

Before doing so, however, it is necessary to consider the law governing the conduct of a court in a case such as is here presented. The rules of evidence and the weight to be accorded to the evidence are the same in a contested will case as in any other civil case, and those rules apply when the question goes to the sufficiency of the evidence to justify its submission to the jury. (*Estate of Arnold,* 147 Cal. 583, [82 Pac. 252].) Without elaboration of the authorities, and contenting ourselves with citing a few of them, the following propositions may be taken as determined beyond controversy: In this state, though the evidence *pro* and *con* upon the issues be substantial and conflicting, it is the duty of the trial judge to set aside a verdict at least once if his conviction is that that verdict is contrary to the weight of the evidence. .(*Estate of Carriger,* 104 Cal. 81, [37 Pac. 785] ; *Estate of Motz,* 136 Cal. 558, [69 Pac. 294] ; *Estate of Everts,* 163 Cal. 449, [125 Pac. 1058].) We say at least once. We are not to be understood as saying that the court's powers and duties in this regard are exhausted by its first action. Our consideration here is not complicated by that question. With the statement that the number of times that a trial judge may so exercise his powers to set aside a verdict in a given case is in many states controlled by statute, as in this state it is not, and that therefore it becomes the duty of the judge to set aside a verdict as often as his conscience is impressed with its injustice, it will suffice upon the general question to cite *Clark* v. *Barney Dumping Co.,* 109 Fed. 235; *In re Geiser,* 129 Fed. 237; *Daniels* v. *Leonard,* 105 Ga. 841, [32 S. E. 122] ; *Dethrage* v. *City of Rome,* 125 Ga. 802, [54 S. E. 654] ; *Howard Express Co.* v. *Wile,* 64 Pa. St. 201; *Van Doren* v. *Wright,* 65 Minn. 80, [67 N. W. 668, 68 N. W. 22] ; *Wilkie* v. *Roosevelt,* 3 Johns. Cas. (N. Y.) 206, [2 Am. Dec. 149] ; *Van Blarcom* v. *Kip,* 26 N. J. L. 351; *Gibson* v. *Hill,* 23 Tex. 77.

Next, it is beyond controversy that the right of a court to direct a verdict is, touching the condition of the evidence,

absolutely the same as the right of the court to grant a nonsuit. It may grant a nonsuit only when, disregarding conflicting evidence and giving to plaintiff's evidence all the value to which it is legally entitled, herein indulging in every legitimate inference which may be drawn from that evidence, the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of plaintiff if such a verdict were given. Of course, if in such a case no motion for nonsuit has been made and the issues have been turned over to the consideration of the jury, and that jury has rendered a verdict in favor of plaintiff, such verdict being unsupported by any substantial evidence, it becomes the imperative duty of the court to set it aside. (*Estate of Arnold,* 147 Cal. 583, [82 Pac. 252] ; *Estate of Chevallier,* 159 Cal. 161, [113 Pac. 130] ; *Marron* v. *Marron,* 19 Cal. App. 326, [125 Pac. 914].) But when, and only when, the evidence of the proponent is thus insufficient, the court may and should, as has been said, grant a nonsuit, and may and should on motion direct a verdict. Thus in *Estate of Baldwin,* 162 Cal. 472, [123 Pac. 267], it is declared that, ''A directed verdict is proper unless there be substantial evidence tending to prove in favor of plaintiff all the controverted facts necessary to establish his case. In other words, a directed verdict is proper whenever, upon the whole evidence, the judge would be compelled to set a contrary verdict aside as unsupported by the evidence. To warrant the court in directing a verdict it is not necessary that there should be an absence of conflict in the evidence, but to deprive the court of the right to exercise this power if there be a conflict, it must be a substantial one." To the same effect are the cases last above cited, as well as *Estate of Morey,* 147 Cal. 495, [82 Pac. 57] ; *Estate of Higgins,* 156 Cal. 257, [104 Pac. 6] ; *Estate of Chevallier,* 159 Cal. 161, [113 Pac. 130] ; *Sill* v. *Ceschi,* 167 Cal. 698, [140 Pac. 949].

The rule as to directed verdicts is not that a verdict may be directed whenever the evidence is such that upon motion the court would grant a new trial. The court may grant a new trial even when there is substantial evidence to sustain the verdict if it believes that the evidence preponderates against the verdict. It is under compulsion to order a new trial, and may do this of its own motion when the evidence is wholly insufficient to sustain the verdict. This is the

meaning of the language in *Estate of Baldwin,* 162 Cal. 471, [123 Pac. 267], where it is said that a directed verdict is proper "whenever upon the whole evidence the judge would be compelled to set a contrary verdict aside as unsupported by the evidence." For a detailed and satisfactory discussion of this proposition reference may be made to *McDonald* v. *Metropolitan Street Ry. Co.,* 167 N. Y. 66, [60 N. E. 282].

To sum up, then, the situation is this: If contestant did present evidence of so substantial a character as that, notwithstanding the conflict raised by proponent's evidence, it would support a verdict in favor of contestant, it would have been error for the court to have granted a motion for a nonsuit and it was error upon the part of the court to direct a verdict for proponent.

To the consideration of contestant's evidence we thus come, bearing in mind that every intendment is to be indulged favoring any reasonable inference which can be drawn and thus might have been drawn by the jury from the direct and positive evidence itself.

Shaopin Caspar was an Armenian, born in Adrianople, Turkey, in 1861. There his early life was spent. Sahmin Babik was his cousin, two years younger. His family also resided in Adrianople, and the families of the two cousins were on intimate terms. Caspar and Babik were playmates. Caspar's parents died when young and he received little or no education. Babik, upon the other hand, was well educated and had held positions of distinction in the Bulgarian government. When eighteen years of age Caspar came to the United States and settled in Lawrence, Massachusetts. There he lived for over twenty-five years. Before departing for the United States he made a journey to the city where his cousin Babik was then residing to bid him good-by. By industry, frugality, and business ability Caspar in Massachusetts achieved comparative affluence. When he died in Los Angeles in 1913, at the age of fifty-two years, his estate was appraised at thirty thousand dollars. For years he was a photographer in Lawrence and did a prosperous business, employing several assistants. In 1911 he moved from Lawrence, Massachusetts, to Los Angeles, and died a year and a half thereafter. He never married, nor did he seem to have sought the society of women. He was a Mason and an Odd Fellow,

and his social activities were confined within the orbits of these orders. He was prudent, frugal, and respected.

In 1904 Babik came to America. He wrote to Caspar from New York, advising him that he was without a position and asked Caspar's advice. Caspar expressed great delight upon receiving this letter. He had seen no blood relative for twenty-two years or more. He wrote a cordial reply to his dear cousin and Babik then went to Lawrence, where the meeting between the cousins was most cordial and affectionate. Babik was married and Caspar gave him a position in his studio and provided him and his wife with a home. He appeared proud of his cousin, of his education, and of the high positions he had occupied, including a secretaryship to the king of Bulgaria, and frequently spoke of these matters to his friends. He made Babik acquainted with his brethren of the Masonic order, introducing him as his cousin and securing his election to membership. In many ways he expressed more than mere affection and admiration for his cousin, declaring his intention to provide for him in his life and at his death as being one of his nearest relatives and the one to whom he was fondly devoted.

In 1905 Emily Ainley, proponent of the will and the sole beneficiary thereunder, arrived in Lawrence with her husband, Sam Ainley. Mrs. Ainley was an immoral and designing woman. Sam Ainley was a complacent husband, if not worse. The two conspired to get Caspar in their clutches and subject him to their domination. This was to be accomplished by the seduction of Caspar, and to the effectuation of this end, with the connivance and procurement of her husband, Mrs. Ainley set herself. She was the janitress in charge of the hallways of the building in which Caspar's studio was situated. She was much younger than Caspar. She was frequently and unnecessarily in his room. She accomplished her purpose and became the mistress of the well-to-do bachelor. The relationship Caspar admitted, with epithets of contempt for the complacent husband, but at that time he regarded the woman as nothing more than his mistress. Mrs. Ainley did not conceal the fact that her designs were meretricious and mercenary. She said that Caspar had a lot of money and she might as well have it as anybody else; that she proposed to get it even if she had to work hard to do it. The relationship between the two seemed to have been

fairly well recognized in Lawrence, and a sister-in-law of Mrs. Ainley protested against it. In 1909 the Ainleys came to Pasadena, California, Caspar paying their fare. On reaching California both husband and wife importuned Caspar to join them. The woman wrote frequently, indeed almost daily. One letter would be couched in terms of fond endearment and longing; the next would contain threats that she would go back to Massachusetts "and show you what I can do to you" if he didn't come out. Ainley likewise wrote, and an extract from one of his letters is as follows: "Mr. Caspar, why do you stay away? You have got enough money. What do you want staying in Lawrence, ruining your health in that old shack. This is Pasadena, the heaven on earth. You want to come out and see it. My wife will take you around. Also my wife, I can't do anything with her, as she has lost her health since she came out here. Every night she won't sleep, she is crying and sobbing, and in the day time she is always thinking of you. I think it will be well for you and will help Emily for you to come out here." Caspar was distressed over these letters. He showed them to his friends. He declared that they were bothering him; that nearly every letter he got from them asked for money. He became nervous and timid over their threats; he was afraid they would drag him into court. He had never been in court and would give anything to avoid going. He consulted an attorney. He did not want his good name destroyed. He was advised to go to California and see the Ainleys and try and fix the matter up. In 1910 he did go to California and was gone three weeks. Upon his return he intimated, if he did not declare, that he had resumed his illicit intercourse with Mrs. Ainley, with the knowledge of her husband. After his return to Lawrence Mrs. Ainley continued to write to him. In 1911 Babik was in France and Caspar a second time joined the Ainleys in California and lived with them until his death. He built a bungalow for the Ainleys, installed them in it, and lived there with them. He became Mrs. Ainley's devoted slave, fetching and carrying, doing servile and menial duties, and was, according to the medical testimony, a masachist—her love-slave. Changes in his demeanor, deportment, and dress were noted. There is testimony of the blandishments and endearments which she practiced upon him. He was "just like her maid." The explanation of both the

Ainleys of this conduct is that it was sexually harmless because Caspar had declared that he was impotent from childhood. Upon one occasion Mrs. Ainley declared that she detested Caspar, but that she proposed to get his money. "He has got more money than anybody has any idea of and he is dead in love with me."

In 1912 Caspar seems to have become nervous, excitable, disheartened, melancholy, absent-minded, preoccupied, and negligent in attire, while before he had been neat. Notwithstanding his years, if it be true that "a man is as old as his arteries," he was rapidly approaching senile decay, for though he died at the age of fifty-two, the cause of his death was brain lesion following arterial sclerosis.

During this time his cousin Babik wrote to him, asking him to lend money to aid him in a business venture. He repudiated Babik in terms of hostility and denied that Babik was related to him. In the latter part of January he was taken to a hospital. He had complained of constipation. While in the hospital the will in question was executed. In the hospital he was stricken with a cerebral hemorrhage. While suffering from this hemorrhage, but after the execution of the will, he was taken back to the Ainley home, and there, five days later, he died.

The hospital charts during the days he was there showed a marked failure of physical powers and control. He could not retain his urine; he vomited; he was kept on a low diet— eggs and milk—which he could not retain. Mrs. Ainley was constantly at the hospital and in attendance on him. Frequently before her he expressed to the attending doctor, who had been called in by Mrs. Ainley and who was not the physician who had previously treated Caspar, his desire to make his will. This physician summoned D. H. Laubersheimer, an attorney at law, for that purpose, and in the hospital and under these circumstances, and in the presence of Mrs. Ainley, Mr. Ainley, Mrs. Ainley's mother, Dr. Cook, and a friend of the Ainleys, George Shaw, and Mr. Laubersheimer, the will was drawn by Caspar, devising and bequeathing all of his estate "to my dear friend Emily Ainley to be hers forever," and appointing her sole executrix, to serve without bonds. The testimony of these witnesses, all favorable to the proponent, is that they were all present at Caspar's request. The attorney, upon asking the sick man if he desired to make

a will, was met with the response that he did not desire to make a will, but that he desired to adopt Mrs. Ainley. Whereupon the attorney asked either Dr. Cook or the whole assemblage, "Is this man competent?" Receiving a favorable answer and proceeding to interrogate Caspar, and learning from him the nature of the will which he proposed to make, he asked him, "Has anyone influenced you to make this will?" The will was thus reduced to writing and presented to Caspar for his signature, with the surprising result that it was found that Caspar could not write his own name. He had suffered a brain lesion, the immediate effect of which was partial paralysis and aphasia. He was able to write in proper order "C-a" or "C-a-s" of his name, but could not remember and so could not write any more of it, or, if he could remember, he could not form the familiar letters. Notwithstanding his serious condition, the will was not only executed, but on that day he was removed from the hospital to the home of the Ainleys, where five days thereafter he died.

An appellate tribunal sitting to review asserted errors at law always regrets the necessity which here confronts us of presenting and analyzing matters of evidence. It regrets the necessity because the analysis of the evidence may be, and frequently is, misunderstood to be an expression of the court's views as to the weight of the evidence. We are here compelled to set forth contestant's evidence for the single and sole purpose of determining whether it has legal weight and substantiability in and of itself, and without regard to the conflicting evidence, to support the issues tendered by contestant, and what has been said and what may be said is to be construed, therefore, solely from this point of view, and not at all as expressing the court's opinion touching the question whether with contestant or with respondent lies the preponderance upon a review of all the evidence in the case. We are not here concerned with the conflicting evidence introduced by proponent. We repeat, we are concerned simply with the determination of the question as to whether the direct evidence introduced by contestant, with the reasonable inferences permissible to a jury to draw therefrom, would have sustained the verdict of the jury in favor of the contestant. If it does, the court's action in directing a verdict against contestant is grave error.

We think upon this proposition that the summary of the evidence above given, omitting, as that summary does, many other evidentiary matters and many reasonable inferences which appellant argues are deducible from that evidence, speaks for itself upon the proposition, without need of lengthy argument—the illicit relation between the deceased and the beneficiary (*In re Flint's Estate,* 100 Cal. 391, [34 Pac. 863]; *Smith* v. *Henline,* 174 Ill. 184, [51 N. E. 227]; *McClure* v. *McClure,* 86 Tenn. 173, [6 S. W. 44]); the beneficiary's expressions of intent to secure the deceased's property; the methods which she adopted to this end; her control and his sex bondage; his repudiation of his blood relatives and disavowal of relationship; the changes in his demeanor, deportment, and character; his physical and mental breakdown at the time of the execution of the will, in and of themselves furnish sufficient and substantial evidence to support contestant's position that the will was the product of a mind upon which undue influence was exercised in the very matter of the testamentary act by the Ainleys. True it is that the opposing testimony is to the effect that the testator was of sound and disposing mind at the time of the execution of the will; that he was not acting under duress or undue influence; that Mrs. Ainley had come into his lonely life and had taken the place to him of a daughter, as evidenced by his expressed desire to adopt her; that he had ceased to care for his cousin, the contestant, because his cousin was incessantly seeking to borrow money from him; that his repudiation of the cousin was not so much a repudiation of the relationship as a declaration of his loss of interest in the man. But when all this has been said, and everything else which could be said upon the question, it does not for one moment militate against the proposition that there is a substantial conflict of evidence upon the matter.

Such being the situation, the court erred in directing its jury. It was the duty of the court under the circumstances to have submitted the cause a second time for the jury's determination, and then a second time, should a motion for a new trial have been made, to act in accordance with the dictates of the law.

We are not here confronted, as has been said, with the conflict between the constitutional right of a litigant to the determination of a jury and the duty of a court to set aside

the verdict of that jury where in its judgment the evidence preponderates against the verdict. The fact that the question is new in this state bears highest testimony to the judicial fairness of trial judges in the matter. We have heretofore cited some of the conflicting decisions upon the matter and mentioned that in some of the states the right of the trial judge to set aside successive verdicts of juries upon the same evidence is controlled by statute. This could easily be done by the legislature of this state and the matter thus removed from the need of judicial consideration, which, however, we repeat, is not pressed upon us here and now.

The judgment appealed from is therefore reversed.

Melvin, J., and Lorigan, J., concurred.

Hearing in Bank denied.