[S. F. No. 7344. .Department Two.—July 27, 1916.]

In the Matter of the Estate of ISAAC J. ROSS, Deceased.
B. F. VAN DYKE, Executor, Respondent, v. T. F.
ROSS et al., Appellants.

ESTATES OF DECEASED PERSONS—WILL CONTEST—NONSUIT—RULE FOR
DETERMINING SUFFICIENCY OF EVIDENCE.—In contests of wills, in
determining whether the evidence presented was sufficient to take the
case from the jury, the entire evidence presented is to be viewed from
a point most favorable to the contestants; any contradictory evidence
is to be disregarded; and all facts supporting the case of contestants
must be taken as true, and all presumptions from the evidence, and
all reasonable inferences susceptible of being drawn therefrom,
must be considered as facts proven in their favor.

ID.—WILL CONTEST—ERRONEOUS ORDER GRANTING NONSUIT.—In a con-
test to revoke the probate of a will on the ground that the testator
was not of sound and disposing mind and memory at the time of its
execution, it is error to grant a motion for a nonsuit at the close
of the contestant's case, where it is shown by the evidence that the
testator, at the time of the execution of the instrument, which was
ten days before his death, was of the age of eighty-six years and six
months, in such an enfeebled physical condition that he was unable
to lift his hand to his face, and in such a mental condition that he
could not remember, frequently could not understand, and was in-
capable of any continued effort of mind or memory.

ID.—PHYSICIAN OF TESTATOR—HYPOTHETICAL QUESTION—BREACH OF
CONFIDENCE.—The testator's family physician, under the guise of a
hypothetical question, cannot disclose facts in violation of the con-
fidential relationship between the testator and the witness.

ID. — MENTALITY OF TESTATOR — REMOTE TRANSACTION — INADMISSIBLE
EVIDENCE.—Evidence as to a single transaction had with the testator
years before the making of his will is properly excluded where it
is not shown that the mentality of the testator at that time was
any different from the conduct of normal men under like circum-
stances.

ID.—MENTAL CAPACITY—WHAT CONSTITUTES.—If a testator is able to
understand and carry in mind the nature and situation of his prop-
erty and his relation to his relatives and those around him, with
clear remembrance as to those in whom and those things in which
he has been mostly interested, capable of understanding the act he
is doing, and the relation in which he stands to the objects of his
bounty, free from any delusion, the effect of disease, which might
lead him to dispose of his property otherwise than he would if he
knew and understood what he was doing, he has the capacity to
make his will.

APPEAL from a judgment of the Superior Court of Alameda County. Wm. S. Wells, Judge.

The facts are stated in the opinion of the court.

Mastick & Partridge, J. W. Dignan, and H. F. Chadbourne, for Appellants.

Driver & Driver, and John L. McNab, for Respondent.

HENSHAW, J.—Appellants instituted a contest to revoke the probate of the will of their deceased father, upon the ground that at the time of the execution of the will he was incompetent and was not of sound and disposing mind and memory. They introduced evidence, and when they rested their case the court granted a motion for a nonsuit upon the ground of the insufficiency of the evidence.

Opposing counsel do not agree upon the principles governing trial courts in granting or refusing to grant nonsuits for insufficiency of the evidence. So often and so clearly has this court spoken upon the subject that it had reason to hope that the guiding principles could not be misunderstood either by judges or attorneys, for the rule is not difficult of comprehension. As said in *Estate of Ricks*, 160 Cal. 450, [117 Pac. 532] : "The rule is well established that in contests of wills, as in other civil actions, in determining whether the evidence presented was sufficient to take the case from a jury, the entire evidence presented is to be viewed from a point most favorable to the contestant. Disregard is had of any contradictory evidence. All facts supporting the case of contestant must be taken as true and all presumptions from the evidence and all reasonable inferences susceptible of being drawn therefrom must be considered as facts proven in his favor. (*Estate of Arnold,* 147 Cal. 583 [82 Pac. 252].)" In *Freese* v. *Hibernia Savings & Loan Society,* 139 Cal. 392, [73 Pac. 172], it is said: "It is not disputed, and cannot well be under the decisions, that a motion for a nonsuit should not be granted where plaintiff's evidence is such, that, if the case had gone to a jury on that evidence and a verdict had been rendered for him, the evidence would be held sufficient to support the judgment upon the verdict. The rules as to nonsuit are the same, whether the trial is by the court or by a

jury." To like effect are *Goldstone* v. *Merchants Ice & Cold Storage Co.,* 123 Cal. 625, [56 Pac. 776], *Davis* v. *Crump,* 162 Cal. 513, [123 Pac. 294], *Burr* v. *United Railroads,* 163 Cal. 664, [126 Pac. 873], with other decisions too numerous to call for mention. Says this court, in *Burr* v. *United Railroads, supra:* "It is elementary that a motion for nonsuit is not to be granted where there is any substantial evidence which, with the aid of all legitimate inferences favorable to the plaintiff, would support a verdict or finding that the material allegations of the complaint are true." And finally it may be added that in *Estate of Caspar,* 172 Cal. 147, [155 Pac. 631], this court, discussing the right and power of the trial court in directing verdicts, in ordering nonsuits, and in granting new trials, said: "Next, it is beyond controversy that the right of a court to direct a verdict is, touching the condition of the evidence, absolutely the same as the right of the court to grant a nonsuit. It may grant a nonsuit only when, disregarding conflicting evidence and giving to plaintiff's evidence all the value to which it is legally entitled, herein indulging in every legitimate inference which may be drawn from that evidence, the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of plaintiff if such a verdict were given. Of course, if in such a case no motion for nonsuit has been made and the issues have been turned over to the consideration of the jury, and that jury has rendered a verdict in favor of plaintiff, such verdict being unsupported by any substantial evidence, it becomes the imperative duty of the court to set it aside. (*Estate of Arnold,* 147 Cal. 583, [82 Pac. 252]; *Estate of Chevallier,* 159 Cal. 161, [113 Pac. 130]; *Marron* v. *Marron,* 19 Cal. App. 326, [125 Pac. 914].) But when and only when the evidence of the proponent is thus insufficient the court may and should, as has been said, grant a nonsuit, and may and should on motion direct a verdict."

With this unquestioned law before us, we may proceed to a consideration of the facts in this case, as shown by the evidence of contestants and appellants. What constitutes the mental capacity to make a will has been declared by this court in *Estate of Motz,* 136 Cal. 562, [69 Pac. 294], quoting from the able case of *Whitney* v. *Twombly,* 136 Mass. 145, the following language: "If he is able to understand and carry in mind the nature and situation of his property and his relation to his

relatives and those around him with clear remembrance as to those in whom and those things in which he has been mostly interested, capable of understanding the act he is doing, and the relation in which he stands to the objects of his bounty, free from any delusion, the effect of disease, which might lead him to dispose of his property otherwise than he would if he knew and understood what he was doing, he has the capacity to make his will.''

It was shown that the testator was eighty-six years and six months of age at the time of his death. The will was executed upon the 31st of October and he died upon the ninth day of November following. For some time before his death he had been bedridden, afflicted with bedsores, totally unable to control his physical functions, and so little able to aid himself that he could not raise his hand to brush away the flies that lit on his face. The contestants are his two sons and only heirs at law. One son, W. J. Ross, is sixty-three years of age; the other son, T. F. Ross, fifty-eight years of age. They had been and were to the time of their father's death devoted sons. They had helped by their own labors during their minority and thereafter to earn the property which their father possessed at the time of his death. They were in attendance upon him during his last sickness, and performed many of the trying but necessary services occasioned by that sickness. They were carpenters by trade, were advancing in years, were dependent upon their manual labor for their support, and had as property no more than home places to the value each of about ten thousand dollars, which their father had given them. By his will he disposed of approximately twenty thousand dollars, a small part of which he left to a grandson, Elmer Ross, in trust for the education of Elmer's children—the testator's great grandchildren—the major portion of it being disposed of in the form of legacies to collateral relatives, to charitable institutions, and to friends. He expressly excluded his two sons—his sole heirs— ''for the reason that I have already provided for them by deeding to them certain real property in the town of San Leandro, the portion of each aggregating approximately the value of $10,000. It is my express desire and intention that the above mentioned W. J. Ross and T. F. Ross shall take nothing more of my property of any nature or description.'' It appears that he died intestate as to certain property, and

that by the terms of the will his sons were excluded from any share even in that. Coming more specifically to the details of the mental and physical condition of the testator at the time of the making of the will in question, the evidence of the sons concerning his physical condition has already been sufficiently outlined. . Further they bear witness that his enfeebled physical condition was accompanied by a corresponding enfeebled mental condition. He could not remember. He frequently could not understand. He had to be carried, and when carried and placed on the bed he "screamed and kicked" and "raved and wanted to know what I was going to do with him." He did not recognize the witness' wife, whom he knew perfectly well, and pushed her away and protested against her presence in the room. He would "sleep a little while and then would holler again." "Often there was nothing wrong with him." "The nurse would come running in to see what was the matter. There would not be anything wrong, only that he was flighty." "He was very often in a stupor. Sometimes he would be in a stupor for two or three hours and in talking his mind wandered. He got so bad two months before he passed out, so bad we had to deny people coming in. He would hold up for a few minutes before them and then go to pieces and talk at random. He was getting weaker and weaker. I think he was of unsound mind because of his actions that we saw every day there. He was getting weaker and worse and worse. He finally got so, when he got so he could not write his own name, he was what you might say paralyzed—just lay there like a dead man." (The testator was able to write, but the will was signed for him, he making his mark.) The nurse in attendance testified to the care and devotion which the sons showed to their father, and his apparent gratitude at having them there in attendance upon him. She corroborated all of the testimony touching the physical condition of the testator, and with the statement of the law before her, as above given (*Estate of Motz,* 136 Cal. 562, [69 Pac. 294]) testified that he was of unsound mind, and "had no memory at all." "Was very notional and flighty." He apparently had temporary control of his faculties to a certain extent, but was not capable of any continued effort of mind or memory. He remembered people, but almost immediately lost memory of passing events. "Each day he remembered less and took less interest in every-

thing." "I felt that the condition of mind that he was in that at the end he would make just what he did make—a muddle of the thing, and I did not want to be a witness to his will as I had to be today." He expressed his intention to the nurse to leave all his property to his sons—the same intention which he had expressed to the sons themselves. Elmer Ross, the grandson and legatee under the will, testified to his belief in his grandfather's mental unsoundness, based upon the way he acted. He testified: "He knew me and had lots of confidence in me; consulted me on many things. Yet, when I would go into the bedroom he wouldn't know me. He wouldn't know me until somebody informed him who I was; not on every visit, but I mean the last month of his sickness. During the last month of his sickness he was in bed practically all the time. He was very weak; couldn't stand alone during the last month, of course." Edgar Ross, another grandson, testifies to his grandfather's unsoundness of mind on the 26th of October, 1913. At that time his grandfather was so weak that he could not answer, "he could not say a long sentence. He had a habit, or I don't know whether a weakness or habit, but he had his eyes closed all the time or most all the time. I started to kill the flies in the room. He was not able to raise his hand and shoo the flies away from his face. He weighed in his prime from 165 to 185 pounds, and had become so emaciated at this time that he weighed no more than 75 or 80 pounds." He had had two paralytic strokes preceding his fatal illness, and he frequently complained of pains in his head. "The principal reason I have for thinking his mind was unsound is that he was not able to carry on any conversation without going to sleep."

It does not seem to us that a discussion of this evidence is necessary. The cross-examination of these witnesses, while it may have impaired the weight to be given to their expressed opinion of the unsoundness of the mind of the testator, did no more than this. One and all the witnesses maintained their opinions and those opinions, taken with the other facts outlined, and with the inferences which might legitimately be drawn from those facts, demanded the submission of the case to the jury, for in ruling upon a nonsuit "all the evidence in favor of the contestant must be taken as true, and if contradictory evidence has been given it must be disregarded." (*Estate of Arnold,* 147 Cal. 583, [82 Pac. 252].)

The reason for this rule is that every litigant who has presented substantial evidence, even under conflict, is entitled as of right in the first instance to the opinion of the jury, voiced in its verdict, upon the weight of that evidence. (*Estate of Caspar*, 172 Cal. 147, [155 Pac. 631].)

In contemplation of the new trial two of the court's rulings upon the matter of evidence require attention. The first of these is the court's ruling sustaining an objection to a purported hypothetical question addressed to Dr. Michael, the testator's family physician. Aside from all objections to the form of the hypothetical question, it cannot be disputed but that if the hypothetical question correctly stated the truth, it was a direct effort to elicit from the testator's family physician in violation of the confidential relationship a statement which of necessity would be based, not upon the facts stated in the question, but on the facts as known to and believed by the physician himself—facts which the law forbade him to disclose. In other words, under the thinnest of disguises the question was an effort to have the witness declare that which the law has said that he should not declare. (Code Civ. Proc., sec. 1881.) The ruling excluding the inquiry was proper.

A witness who had had a single transaction with the testator years before the making of the will, which transaction, as he describes it, was "simply a real estate transaction," was asked to tell the story. Objection was made and sustained. The objection was that the period was too remote for the purpose of showing the mentality of the testator at the time of the execution of the will. There was nothing to show, nor did contestants offer to show, that the conduct of the testator at that time was any different from the conduct of normal men under like circumstances. The ruling rejecting the evidence was therefore proper.

For the reasons already given the court erred in granting the nonsuit. Wherefore the judgment is reversed and the cause remanded.

Melvin, J., and Lorigan, J., concurred.