[Civ. No. 6094. Second Appellate District, Division One.—October 30, 1928.]

In the Matter of the Estate of ANNA M. IVEY, Deceased. PEARL L. BROWN et al., Appellants, v. MAUD L. NELSON et al., Respondents.

Duke Stone for Appellants.

R. D. McLaughlin and J. B. McLaughlin for Respondents.

HOUSER, J.—From the record it appears that Anna M. Ivey made her will by which she devised and bequeathed

the greater part of her estate to her two living daughters. Following her decease, and after her will had been admitted to probate, two of her grandchildren, who were children of a deceased daughter of the testatrix, instituted a contest of the will on each of the grounds of insanity and of undue influence. On the trial, at the close of the evidence introduced by contestants, on motion made by the proponent of the will, the trial court ordered a nonsuit as to each of the issues presented by the contest, and judgment was entered accordingly. It is from such judgment that this appeal is taken.

While the notice of appeal purports to be taken from "the whole" of the judgment, the only point presented for consideration of this court is "whether or not Mrs. Ivey at the date of the execution of the will was of sound mind."

In substance, it appears that the evidence adduced by the contestants on the trial of the action showed the following state of facts: At the time the will was executed Mrs. Ivey was niney-two years of age. She was nearly blind, and because of her infirmities was constantly under the care of an attendant. On account of her defective sight, she was unable to read, and could write her name only when her hand was placed in position to do so. Covering a comparatively short period of time preceding the execution of the will, which occurred seventeen days before the demise of Mrs. Ivey, as well as subsequent to the date on which the will was signed and up to the time of her death, the physical and mental condition of Mrs. Ivey was described by various witnesses. For the greater part, the following are excerpts taken from the testimony of five different witnesses: "She looked very bad . . . She was very weak . . . Failing . . . There were times when she was very rational and there was times when she was anything but right . . . At times she seemed rational; then again she did not. . . . She was physically very weak and very feeble, and mentally in one sentence she was fairly rational; the next she would contradict it and be absolutely irrational . . . One minute she did (appear to know what she was talking about) and one minute she did not . . . At times she seemed perfectly rational in her talking, and at other times she would appear to repeat, and so forth . . . She talked irrational; I would

say she was irrational for a year before she passed away, not at all times; she had periods of being rational, and then again she was absolutely irresponsible . . . The last visits (within a week of Mrs. Ivey's death) she was very much excited and was not clear in just what she was saying . . . A few weeks before her death she seemed very bad, very irrational."

Furthermore, with reference to the instability of mind of Mrs. Ivey, the following statements were also made by different witnesses: "She would make statements and then she would contradict them in the same breath, and she said a great many things about her daughters' girls, things that were out of all reason to say against anybody . . . Quite frequently (she contradicted herself) . . . She said things and contradicted things and made statements that I knew were not so." A witness narrated the following incident as a part of a conversation which took place between her and Mrs. Ivey at a time when Mrs. Ivey was quite ill and about one week before she died: "Well, she told the lady she had housekeeping for her to go and get her sweater. She said Mr. Nelson had given her a sweater and she wanted me to see it, and the lady went and got it, and she says, 'Now, this is purple, isn't it? I can't see whether it is purple, or what, but they tell me it is purple.' I said, 'Yes, it is purple.' She said, 'Do you know what I want you to do?' I said, 'No.' She said, 'I have some white feathers. I want you to take them white feathers over home and color them purple like this sweater.' I said, 'What are you going to do with them?' She said, 'I am going to have a bonnet made.' I said, 'Are you going to take a trip?' She said, 'Yes, I am going to Sacramento. I want those feathers colored purple to put on my bonnet and I am going to take a trip.' "

As to her memory, the following appeared in evidence: "Well, when I went there she seemed to be very poorly, but as she grew older, and as long as I was there, she was getting very poor and her memory was failing a good deal . . . She was very forgetful . . . At times she had no memory . . . I would say she rambled a good deal, what I mean by that, she would talk about things and switch about to other things and contradict herself. In other words, she

would not stay put on any one subject only for a moment or two . . . She would ask a question and then before you could give her an answer she would repeat the question, and if you gave her an answer she would say, 'Oh, never mind, never mind.' . . . She talked the same thing over and over again . . . She would talk it (the same subject) over several times during the day . . . She would go from one thing to another . . . One thing she would say which there was no truth or sense in, she just said, 'I have done something I shouldn't.' I said, 'What have you done?' She said, 'Oh, I don't remember. I just don't remember; I just don't remember.' That is all I could get out of her."

It also appeared in evidence that Mrs. Ivey talked to herself; that she would talk as though she were conversing with persons who were not present. Some months preceding her death a pet dog owned by Mrs. Ivey died. After the death of the dog, while lying in her bed, Mrs. Ivey "talked to this dog, purporting to pet it, and instructed her nurse or attendant about the care of the dog, and she would then call for the dog to have it brought to her bed and attempt to converse with him." A half dozen times a day she would call for this dead dog. With reference to another purported hallucination of the testatrix, the evidence included the following conversation, which took place between Mrs. Ivey and one of the contestants:

"She said to me one day, 'Pearl, what is that across the street?' I said, 'Where do you mean, grandma?' She said, 'Up in that window, isn't somebody standing over there?' I said, 'No.' She said, 'Look again, I think there is somebody in the window.' I said, 'No, grandma, there is only the lace curtain and the shade in the window.'"

It further appears that Mrs. Ivey was in the habit of hiding rather large sums of money about the house where she lived and that on one occasion, perhaps wrongfully, she accused someone of stealing same.

Shortly before her death Mrs. Ivey was "very much upset. She looked to me, looked like as though she had been harassed and driven to death . . . She slept most of the time, and seemed to be in a daze. She would mumble . . . Her conversation was not coherent and clear. She would mumble . . . She would be sitting there and just doze off

like she was going to sleep. She told me one time, 'I think I have sleeping sickness, I sit here and I go to sleep all the time.' . . . She would talk awhile and then she would stop talking and she would mumble something. I couldn't understand what she said. . . . Wouldn't say a word for perhaps twenty minutes . . . She would take naps in the daytime . . . She appeared to be very drowsy and very weak . . . She was inclined to be drowsy . . . Seemed downhearted; she couldn't hardly talk . . . She would cry and then she would talk and then she would cry . . . She appeared to be rational . . . then she got into a terribly nervous state and began to cry . . . She would cry a good deal. She often said, 'Oh, I wish I was dead.' About three weeks before her death she was lying in bed . . . Then she seemed to lapse into sort of a coma, something of that kind . . . I thought she was dying.''

Based upon at least some of the foregoing circumstances, each of five different witnesses, who were intimate acquaintances of the deceased, expressed the opinion that she was of unsound mind.

■ Broadly speaking, the rule is well established that in civil actions a motion for nonsuit may be granted only where the plaintiff's case is entirely unsupported by evidence, or where no evidence has been presented upon some indispensable averment of the complaint. ■ More particularly, an order of nonsuit should not be made when the plaintiff has produced any evidence, or, as sometimes stated, any substantial evidence which, freed from conflicts, contradictions, or inconsistencies therein, and viewed in its most favorable light, together with all legal inferences and presumptions deducible from such evidence, would tend to support the plaintiff's case and a judgment in his favor. If different conclusions reasonably may be drawn from the evidence so interpreted, or even if any doubt exists as to whether such evidence be sufficient, the motion for a nonsuit should be denied. (9 Cal. Jur., p. 558, and cases there cited.) Among the several authorities supporting the foregoing declarations of the law may be found the following statements:

''A nonsuit should be denied where there is any evidence tending to sustain plaintiff's case, *without passing*

*upon the question as to the sufficiency of such evidence.''*
(*Zilmer* v. *Gerichten,* 111 Cal. 73, 77 [43 Pac. 408, 409].)

''It is elementary that a motion for nonsuit is not to be granted where there is any substantial evidence which, with the aid of all legitimate inferences favorable to the plaintiff, would support a verdict or finding that the material allegations of the complaint are true.'' (*Burr* v. *United Railroads,* 163 Cal. 663, 665 [126 Pac. 873, 874].)

'' . . . In order to sustain a motion of this kind the defendant is bound to make a case *so free from doubt* that the court can say that there is no reasonable ground upon which it can continue to entertain the case or put the defendant to his defense. *If there is any question of doubt left,* the court is bound to leave the parties to their proof and final hearing. . . . '' (*Wehner* v. *Bauer,* 160 Fed. 240, 245.)

''It is the duty of the court *if there be any doubt* to let the case go to the jury.'' (*Bush* v. *Weed Lumber Co.,* 55 Cal. App. 588, 590 [204 Pac. 24, 25].)

In *Hoff* v. *Los Angeles-Pacific Co.,* 158 Cal. 596, 599 [112 Pac. 53, 54], the following is quoted with approval from *Kramm* v. *Stockton Electric R. R. Co.,* 3 Cal. App. 606, 609 [86 Pac. 738, 739] : ''The motion for nonsuit admits the truth of plaintiff's evidence, and every inference of fact that can be legitimately drawn therefrom, and upon such motion the evidence should be interpreted most strongly against the defendant. If there is any evidence *tending* to sustain plaintiff's action the nonsuit should be denied, *without passing upon the sufficiency of such evidence,* and where there is a conflict in the evidence, some of which *tends* to sustain the plaintiff's case, a motion for a nonsuit should not be granted. . . . ''

See, also, *Goldstone* v. *Merchants' Ice etc. Co.,* 123 Cal. 625 [56 Pac. 776].

And in *Bush* v. *Wood,* 8 Cal. App. 647, 651 [97 Pac. 709, 710], it is said:

''From the foregoing it is clear that it makes no difference, where the motion for a nonsuit is made on the close of plaintiff's case, *whether the court itself believes the testimony presented or not,* for, as is obvious, the material facts which the evidence tends to prove must be assumed to be true for the

purposes of the motion, just the same as the material facts alleged in a pleading must be so treated in the consideration of a demurrer to such pleading. . . . ''

Nor is the principle limited to the ordinary civil case. It has its similar and complete application in a case involving the contest of a will; and in applying the rule no court of appellate jurisdiction is warranted in drawing any distinction between different classes of civil cases.

In *Estate of Caspar,* 172 Cal. 147, 149 [155 Pac. 631, 632], it is said:

'' . . . The rules of evidence and the weight to be accorded to the evidence *are the same in a contested will case as in any other civil case,* and those rules apply when the question goes to the sufficiency of the evidence to justify its submission to the jury. . . . ''

In *Estate of Arnold,* 147 Cal. 583, 586 [82 Pac. 252, 253], in discussing the question involved in a motion for nonsuit, in part the court used the following language:

'' . . . In determining whether or not in a proceeding to contest a will, the evidence produced by the contestants is sufficient to require the submission of the case to the jury *the same rules apply as in civil cases.* Every favorable inference fairly deducible and every favorable presumption fairly arising from the evidence produced must be considered as facts proved in favor of the contestants. Where evidence is fairly susceptible of two constructions, or if either of several inferences may reasonably be made, the court must take the view most favorable to the contestants. All the evidence in favor of the contestants must be taken as true, and if contradictory evidence has been given it must be disregarded. If there is any substantial evidence *tending* to prove in favor of the contestants all the facts necessary to make out their case, they are entitled to have the case go to the jury for a verdict on the merits.'' (*Vermont etc. Co.* v. *Declez,* 135 Cal. 579 [87 Am. St. Rep. 143, 56 L. R. A. 728, 67 Pac. 1057]; *Freese* v. *Hibernia Sav. & L. Soc.,* 139 Cal. 392 [73 Pac. 172]; *Hanley* v. *California etc. Co.,* 127 Cal. 237 [47 L. R. A. 597, 59 Pac. 577]; *Ferris* v. *Baker,* 127 Cal. 522 [59 Pac. 937]; *Goldstone* v. *Merchants' etc. Co.,* 123 Cal. 625 [56 Pac. 776]; *Zilmer* v. *Gerichten,* 111 Cal. 73 [43 Pac. 408]; *Pacific M. L. I. Co.* v. *Fisher,* 109 Cal.

566 [42 Pac. 154]; *O'Connor* v. *Hooper,* 102 Cal. 528 [36 Pac. 939].)

And in *Estate of Newhall,* 190 Cal. 709, 719 [28 A. L. R. 778, 214 Pac. 231, 235], where a similar question was before the court, the rule is thus stated:

"It is, of course, the general and well-understood rule that ordinarily upon a motion for a nonsuit, in civil cases generally, every inference favorable to plaintiff's case deducible from the evidence and every favorable presumption resulting fairly from the evidence must be taken in favor of plaintiff's case. *This rule applies with equal force to cases of contests of wills.* Of course, if the evidence is fairly susceptible of two constructions, or if several inferences may reasonably be made from the evidence as a whole, it goes without saying that the view most favorable to the contestant must be taken. And further, all of the evidence in favor of the contestant must, as against a motion for a nonsuit, be taken as true, and contradictory evidence, if any, must be disregarded. This having been done, if there is any substantial evidence *tending* to prove the fact necessary to make out the contestant's case, the motion for a nonsuit must be denied and the case given to the jury" (citing cases).

Likewise, *In re Ross,* 173 Cal. 178 [159 Pac. 603], where the following language in *Estate of Ricks,* 160 Cal. 450, 459 [117 Pac. 532, 536], is quoted with approval:

"The rule is well established that in contests of wills, as in other civil actions, in determining whether the evidence presented was sufficient to take the case from a jury, the entire evidence is to be viewed from a point most favorable to the contestant. Disregard is had of any *contradictory evidence.* All facts supporting the case of the contestant must be taken as true and all presumptions from the evidence and all reasonable inferences susceptible of being drawn therefrom must be considered as facts proven in his favor. . . . "

Ordinarily, it may be said that on the contest of a will on the ground of insanity of the testator the particular issue to be submitted for the determination of the jury is whether at the time of the execution of the will the testator was possessed of testamentary capacity. Naturally, the contestant of a will is rarely able to produce any evidence favoring his contention excepting that which relates to con-

ditions surrounding the testator either before or after the will was executed. If the will be holographic, direct evidence of the condition of mind of the testator is practically impossible of production. If executed before witnesses who in writing probably have attested the soundness of mind of the testator, such witnesses may scarcely be presumed to be willing to stultify their former solemn declarations. And so it happens that, in the nature of things, what transpired at the exact moment when the testator affixed his signature to the document and when the witnesses, if any, certified to the facts required by the statute are facts ordinarily extremely difficult of production by the contestants, or, if such facts be within his ready power to produce, are quite in conflict with the other evidence by which the contestant may hope to sustain his theory of the case. Consequently for the support of his cause the contestant must rely upon a showing of conditions existing either preceding or following, or both preceding and following, the precise moment when the testator signed his purported will.

█ Testamentary capacity may be manifested by the present ability of the testator to grasp and to hold within his mental faculties all conditions necessary to the future disposition of his property. Assuredly, he must realize the nature, extent and effect of his act, not only as relates to the property itself, but as well, to both the persons who are to be pecuniarily benefited thereby and those who stand in such a relation to the testator as naturally to have claims upon his bounty, and also such of the latter class who are either entirely omitted from the beneficial provisions of the will, or who are subjected to adverse discrimination thereby. More concise, and perhaps more nearly accurate, is the statement contained in *Estate of Sexton*, 199 Cal. 759, 764 [251 Pac. 778, 780], that:

"A testator is of sound and disposing mind and memory if, at the time of making his will, he has sufficient mental capacity to be able to understand the nature of the act he is doing, to understand and recollect the nature and situation of his property and to remember, and understand his relations to, the persons who have claims upon his bounty and whose interests are affected by the provisions of the instrument" (citing cases).

· While the rule in the abstract may not be so difficult in its formulation, its application to concrete facts presents some obstacles. Measured by such a rule, it is obvious that the legal requirements imposed upon an aged multimillionaire, possessed possibly of dozens or hundreds of different kinds of properties, each having a value differing from each of the others, having several living sons and daughters, some grandchildren who are children of a deceased son or daughter of the testator, numerous dependent brothers, sisters, cousins, or other relatives, close friends, faithful employees, trusted servants, partners, and associates in business, presenting many difficult and complex financial situations and complications arising from or incident to the disposition of a vast fortune, necessarily would present a severe test upon testamentary capacity; whereas a widower with two living sons and no other living relatives, whose sole possession is $500 in cash, and who is confronted with none of the attachments or situations ordinarily surrounding a man of great wealth, will suffer comparatively little mental strain in qualifying for the legal ordeal. It results that, viewed superficially, the law does not appear to bear impartially, or uniformly, or with equal severity, upon all persons. If perchance on a given date, measured by the rule of thumb, the man of immense wealth, though wishing to make a will, and understanding perfectly the nature of the proposed act, be unable to remember and to carry in his mind the various details concerning the nature, situation and extent of his numerous properties, together with the number and names of his relatives, friends, employees, servants and business associates (assuming that each of them has some claim upon his bounty) and consequently be to that extent of ''unsound mind''—but by reason of some turn of the wheel of fortune, or by reason of some great catastrophe, his vast wealth be swept away in one night and all his servants, employees, friends and relatives, other than two sons, be killed, and thereby he have remaining but a comparatively small pittance for testamentary disposition, with no one other than two living sons having a claim upon his ''bounty''—however deep and abiding his grief, or how intense his anguish, if then, in his altered circumstances and on the day following such determination of his lack of testamentary capacity, he still desire to make his will and can but correctly re-

member that his sole possession consists of $500 in cash, and that of all his former relatives, friends, etc., his two sons are the sole survivors, on that instant his late "unsoundness of mind" will be completely cured and his "testamentary capacity" be perfectly restored. The brain of the millionaire may be unsound; but the same brain, transferred to the comparatively impecunious individual, unquestionably will be capable of complying with all legal requirements. It thus becomes apparent that, tested by the rule of law to which reference has been had, memory, and not necessarily brain power, or even super-intelligence, is the all-important and essential prerequisite to legal ability to dispose of property by will. ■ As hereinbefore suggested, while the ultimate question always is whether at the very instant the will was executed, was the testator of sound mind, nevertheless testamentary capacity may be indicated by circumstances and conditions surrounding the testator both before and after the execution of the will, respectively, just as certainly, clearly, and unmistakably as by evidence of what was the general conduct and condition of the testator at the very instant that the testator affixed his name to the instrument. Evidence of whims, fantasies, vagaries, hallucinations, or delusions in the mind of the testator at a time shortly preceding the execution of the will, and also at a time closely following its execution, would constitute a foundation for an inference that the condition of mind of the testator was at least unstable at the very moment when the signature of the testator was affixed to the instrument. Just so, abnormally advanced age, weakened physical condition, "terribly nervous state," excitability, repeated periods of weeping, "very much upset," presenting the appearance of having been "harassed and driven to death," irrationality, irresponsibilty, incoherency, mumbling, rambling, talking to persons not present, contradictions or inconsistencies in speech, inability to carry the thread of a conversation, repetition of statements, the making of improbable or palpably untrue statements, general loss of memory, downheartedness, wishing he were dead, drowsiness, sleeping most of the time, in a daze and finally, coma in the testator, together with the respective opinions of several of his intimate acquaintances to the effect that the

testator was of unsound mind—would constitute some substantial evidence that the testator was not entirely normal in either mind or body, or possessed of testamentary capacity. Universally it is conceded that evidence of such facts as heretofore have been set forth herein is admissible for the very purpose of *tending* to prove the unsoundness of mind of the testator. It is manifest that unless such facts tend to prove unsoundness of mind they are wholly irrelevant to the issue and consequently inadmissible in evidence. Unless relevant, they would be utterly useless and have no legitimate place in the evidence. Being clearly pertinent to the injury, the conclusion is irresistible that they furnish some *substantial evidence* relating to the testamentary capacity of the testator. ■ The authorities to which attention has been directed herein are to the effect that if *any substantial evidence* be adduced by the contestant, based upon which reasonable men might differ as to whether the testator was of sound mind, a motion for a nonsuit may not be legally granted. It would seem so clear as to be beyond controversy that one reasonable man might differ from another as to the effect of the evidence herein regarding the question of the unsoundness of mind of the testatrix. At least, the correct determination of the question is not "free from doubt." Considering that according to the evidence, which, freed from inconsistencies or contradictions, shows conclusively that as to the testatrix each of the conditions referred to herein was present, both practically immediately before and, as well, closely following the time when the will was executed, we are constrained to hold that the requirements as to the *quantum* of evidence essential to the submission of the question to the jury was presented by the contestant, and consequently that the motion for nonsuit should have been denied. In so ruling this court is not unmindful of recent decisions of the supreme court of this state which may seem to indicate that the ruling by the trial court was proper. But in none of such cases was the evidence anything like as great in volume or in quality as it was in the instant case. After all that may be said or written affecting any particular case, the law as therein laid down has its application more peculiarly to that one case; and while the principle of law therein announced may have

its application to other cases, the decision of each case must ultimately rest upon its own facts.

The judgment is reversed.

Conrey, P. J., and York, J., concurred.

A petition for a rehearing of this cause was denied by the district court of appeal on November 19, 1928, and a petition by respondents to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on December 27, 1928.

All the Justices concurred.